**Opinion issued April 6, 2017.**



In The

# Court of Appeals

### For The

# First District of Texas

———————————

### NO. 01-16-00004-CR

### NO. 01-16-00005-CR

———————————

### TRENTON AVERY ASHTON, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

### On Appeal from the 405th District Court
### Galveston County, Texas
### Trial Court Case Nos. 13CR3370 and 13CR3371

---

## O P I N I O N

A jury found appellant, Trenton Avery Ashton, guilty of two charges of aggravated sexual assault of a child younger than fourteen years of age,[1] and the jury

---

[1]    TEX. PENAL CODE ANN. §§ 22.021(a)(1)(B)(i)-(ii), (a)(2)(B) (West Supp. 2016).

assessed his punishment in both cases at thirty-eight years' incarceration, with sentences to run consecutively. In three issues, appellant argues that: (1) the trial judge erred by denying his motion for mistrial after it was revealed during trial that two jurors knew the investigating detective; (2) the trial court erred by failing to instruct the jury in cause number 13CR3370 that it must unanimously find that a single incident of the charged offense was proven beyond a reasonable doubt; and (3) the trial court erred by failing to instruct the jury in cause number 13CR3371 that it must unanimously find that a single incident of the charged offense was proven beyond a reasonable doubt. We affirm the trial court's judgment.

## Facts and Proceedings

### A. Factual Background

In 2013, J.W. began babysitting seven-year old J.S. at J.W.'s home four nights a week while the boy's mother worked the night shift. J.W. shared her home with her husband and nephew, as well as her son, appellant.

J.S.'s mother, the outcry witness, testified that, on November 18, 2013, J.S. told her that appellant "stuck his wee-wee in my butt" and "white stuff came out." He also told her that appellant stuck his "wee-wee" in his mouth and asked him what it tasted like. J.S. told her that he did not like what appellant had done to him because it hurt and it made J.S. cry. J.S. also told her that the incident happened on the third day of her work cycle, which would have been November 14, 2013.

2

J.S., who was nine years old and in the fourth grade at the time testified that appellant's mother babysat him when he was in second grade. According to J.S., his mother would drop him off at appellant's home in the afternoon, and then pick him up early the next morning and take him home. When he stayed at appellant's home, J.S. slept on a mattress on the floor of appellant's room. No one else slept in appellant's room.

J.S. testified that "sometimes" appellant would tell him to pull his pants down and get on the ground. Appellant would then stick his "wee-wee" inside J.S.'s butt, sometimes sticking it in "all the way," which "felt like it was burning." Appellant would also tell J.S. to put his mouth on appellant's "wee-wee," and tell him to suck it. J.S. testified that he saw "white stuff" come out of appellant's "wee-wee" on one occasion. J.S. testified that this happened "three or four times." According to J.S., appellant told him that he would give J.S. a dollar if he did not tell anyone about the assaults. Using a doll, J.S. also demonstrated the assault by anal penetration for the jury. J.S. pulled the doll's pants and underwear down and then placed the doll's hands and legs on the ground. Although J.S. acknowledged that his mother had helped him remember a lot of the story, he also testified that he did not talk to anyone about changing his story.

J.S. received a forensic sexual assault exam on November 19, 2013. The sexual assault nurse examiner (SANE) who examined J.S. testified about the

3

examination and relied upon a four-page report that she had prepared documenting the exam. The report stated in part:

> When my baby-sitter isn't around her son, [appellant], puts his wee wee in my butt and then sometimes he makes me taste it. When he puts it all the way in my butt it hurts and it makes me cry. He gives me a dollar and tells me not to tell anybody. He did it to me on Thursday and then again on Friday in the afternoon when I get there.

The SANE's report noted that the sexual assaults occurred on November 14, 2013 and the afternoon of November 15, 2013. The SANE collected evidence, including various swabs, combings, and the underwear J.S. was wearing during the examination. She found that J.S. had no trauma or injury. The SANE testified, however, that her findings were consistent with a sexual assault, the absence of an injury to the anus is not determinative of whether an assault occurred, and she had "no reason not to believe" what J.S. told her.

The SANE's supervisor, the clinical director of forensic nursing services, testified that she reviewed the SANE's report. According to the director, penetration of the anus by a male sexual organ does not always cause injury because the anus is an elastic muscle, and something would have to stretch the anus past its capacity in order to tear the tissue. She further testified that the more time that passes between the assault and the examination, the lower the opportunity for the presentation of an injury because of the healing properties of the body. She also testified that no medical test existed that could conclusively prove that penetration had occurred.

4

A forensic interviewer with the Child Advocacy Center interviewed J.S. on November 20, 2013. She testified that J.S. was "very descriptive" when he discussed the assaults and that, although he was upset, J.S. answered all of her questions during the interview. She also testified that when she asked J.S. about the position he was in during the assaults, he demonstrated it. The forensic interviewer explained to the jury that J.S. physically put himself in a dog-like position on the floor and then moved back and forth.

Detective Earl Mendenhall with the Texas City Police Department was assigned to appellant's case. Detective Mendenhall testified that statements were taken from J.S.'s mother, appellant, appellant's mother, appellant's aunt, and appellant's friend over the course of his investigation. He also arranged for J.S. to be interviewed at the Children's Advocacy Center by a specially trained forensic interviewer. Detective Mendenhall testified that he subpoenaed a DNA sample from appellant that was sent to a forensic crime lab. Nothing of evidentiary value, however, was obtained after analysis.

Appellant gave a voluntary statement to Detective Mendenhall on November 25, 2013. A video of the interview was admitted into evidence and published to the jury. During that interview, appellant repeatedly denied all allegations of sexual misconduct or assault against J.S., telling the detective that he thought of J.S. as a little brother.

During the interview, Detective Mendenhall told appellant that J.S. had been specific about what appellant did to him. Appellant denied being naked with J.S., having J.S. bend over, ejaculating in front of J.S., putting his penis in J.S.'s mouth, or asking J.S. to lick his semen off of his penis. When the detective asked appellant if J.S. was lying, appellant responded, "Yes, sir."

When Detective Mendenhall asked appellant if he wanted to tell him about what had transpired with J.S. or to ask any questions, appellant offered his version of events. Appellant explained that J.S.'s allegations might have been prompted by a phone conversation appellant had with his friend on November 12th or 13th that J.S. had overheard. According to appellant, his friend called him on the phone and told him to watch a YouTube video. Appellant said the video dealt with the subject of pedophilia and rape, but was meant to be comical. Appellant watched the video in his bedroom, conversing with his friend while J.S. slept on the floor. Appellant claimed that he initially believed that J.S. was asleep, but at one point, he saw J.S. open one eye. Appellant told J.S. to go back to sleep or he would tell his mother, and J.S. quickly put the cover over his head. Appellant told the detective that he suspected that J.S. may have heard the audio from the YouTube video, as well as appellant speaking to his friend about the video.

Appellant's friend, however, told the detective that he never had any such conversation with appellant. At trial, appellant's friend testified that he did not have

6

any phone conversations with appellant in November 2013 and that he did not send appellant any Internet links to pedophilia parodies or share any jokes with appellant about men having sex with little boys. He further stated that he had never seen a pedophilia parody and was unfamiliar with what it was.

After the State rested its case, appellant called three witnesses: his aunt, his mother, and his stepfather. Appellant's aunt testified that she had known J.S.'s mother for almost twenty years, and had known J.S. since he was born. She claimed that J.S. had a big imagination for his age. She testified that she had expressed concern to J.S.'s mother about his previous babysitters because J.S.'s mother did not know these babysitters personally. Appellant's aunt testified that she did not think that J.S. was safe with his prior babysitters because of some of the things J.S. had complained about. Appellant's aunt also testified that she never had any concern with appellant being around her children.

Appellant's mother, J.W., testified that she began babysitting J.S. after his mother had experienced problems with another babysitter. She claimed that J.S. would be asleep by the time appellant came home each night between 9:00 p.m. and 10:00 p.m. She further testified that she could "hear everything" that happened in the apartment during the night, including when someone was walking around the apartment and everything that occurred in appellant's bedroom. Appellant's mother also claimed that she did not allow appellant to shut the door to his bedroom at night.

7

She further testified that she never had any concern about appellant being around small children. She was shocked by the allegations against him, and did not believe they were true.

Appellant's stepfather also testified that he could hear what was going on anywhere inside the apartment. Like appellant's mother, appellant's stepfather testified that he never had any concern leaving appellant with a small child, and was shocked by the allegations against his stepson.

## B.     Procedural Background

During voir dire, appellant's counsel posed the following question to the panel:

> Is there anybody on this side and I ask you that your family works for the police department or – I'm not talking about your brother's sister's mother's cousin. I'm talking about somebody you talk to.

Counsel later expanded the inquiry to also include close relatives who work in other law enforcement agencies, such as the FBI.

Neither appellant's counsel nor anyone else mentioned Detective Mendenhall by name during voir dire. Approximately seventeen panel members responded to defense counsel's inquiry, including Juror No. 6. Juror No. 6 disclosed that his cousin was a lieutenant at the Seabrook Police Department, but he did not mention Detective Mendenhall.

During a break in Detective Mendenhall's testimony, and outside the presence of the jury, the trial judge informed the parties that he had just learned that the detective knew two of the jurors. The trial judge stated that he understood that the detective knew one juror "apparently fairly well on a personal basis" and the other juror not as well. The trial judge questioned both jurors in the presence of counsel about their relationships to Detective Mendenhall.

Juror No. 1 testified that he was employed as a maintenance manager at a local convenience store and that Detective Mendenhall had worked security at the same store on four or five occasions. According to the juror, Detective Mendenhall had not worked at the store within the prior two months, and although they had exchanged pleasantries, the two men never spoke at length. The juror testified that his relationship with the detective would not influence his assessment of his credibility and that he believed that he could be a fair and impartial juror in the case.

Juror No. 6 testified that he knew Detective Mendenhall pretty well and that he met the detective through the detective's wife's sister. The juror also testified that he did not see Detective Mendenhall on a regular basis, he had never been to the detective's home, and his relationship with the detective would not influence his decision in the case. He further stated that he would not hold the detective in a higher regard than other witnesses and he felt that he could still be a fair and impartial juror in the case.

9

Appellant moved for a mistrial, but the trial judge denied the motion.

DEFENSE COUNSEL: Yes, Your Honor. The Defense moves for a mistrial. The conflict here, even though these two people say they wouldn't change it in any way, they have a personal relationship with the investigator here. Even though they say, "I won't hold him to more regard, it's natural. It's natural for someone to hold someone in regard that they see and know. And I'm asking for a – in the interest of justice to grant a mistrial.

THE COURT: Okay. The motion for mistrial is denied. Both sides have an opportunity to ask questions and we've assessed these jurors with statements and they said what they're going to say and both of them have made it clear that they're not going to hold the detective in a higher regard. They're going to assess his credibility the same as they would any other witness; and therefore, I don't see any grounds for a mistrial.

DEFENSE COUNSEL: Yes, Your Honor. We just reurge the mistrial; and we'll accept your ruling on it, but we don't agree with it.

THE COURT: I can understand and appreciate that, [counsel], but ruling stands.

DEFENSE COUNSEL: Thank you.

After the jury returned to the courtroom, the trial judge informed them that if they personally knew a witness in the trial, they needed to notify the bailiff "at the first possible break."

## C.  Jury Charges and Deliberation

At the conclusion of the guilt/innocence phase, the trial court charged the jury separately with respect to both counts of aggravated sexual assault of a child under fourteen years of age at issue.

In trial court cause number 13CR3370, the charge's application paragraph instructed the jury to find appellant guilty of aggravated sexual assault of a child under fourteen years of age if it found beyond a reasonable doubt that "on or about the 14th day of November, A.D., 2013, in Galveston County, Texas, [appellant] did then and there intentionally or knowingly cause penetration of the anus of [J.S.], a child who was then and there younger than 14 years of age, by the sexual organ of [appellant]."

In trial court cause number 13CR3371, the charge's application paragraph instructed the jury to find appellant guilty of aggravated sexual assault of a child under fourteen years of age if it found beyond a reasonable doubt that "on or about the 14th day of November, A.D., 2013, in Galveston County, Texas, [appellant] did then and there intentionally or knowingly cause penetration of the mouth of [J.S.], a child who was then and there younger than 14 years of age, by the sexual organ of [appellant]."

Neither jury charge instructed the jury that its verdict must be unanimous. During deliberations, the jury asked to review appellant's videotaped interview and the portions of J.S.'s testimony regarding oral penetration. The jury specified that there was disagreement as to whether J.S. testified that any oral penetration had occurred.

**Motion for Mistrial**

In his first issue, appellant argues that the trial court erred by denying his motion for mistrial when it was revealed after the jury had been sworn that two jurors knew the detective. Specifically, appellant contends that he was egregiously harmed when information about the two jurors' relationships to the State's lead investigator, Detective Mendenhall, was withheld from appellant until mid-trial, thus violating appellant's constitutional right to an impartial jury.

**A.     Standard of Review**

The United States and Texas Constitutions guarantee a person the right to trial by an impartial jury. U.S. CONST. amend. VI; TEX. CONST. art. 1, § 10. When a person serves on a jury but is partial, biased, or prejudiced and that juror is selected not through the fault or lack of diligence of defense counsel but based on inaccurate answers in voir dire, a new trial can be obtained. *Von January v. State*, 576 S.W.2d 43, 45 (Tex. Crim. App. 1978); *see Salazar v. State*, 562 S.W.2d 480, 482 (Tex. Crim. App. 1978). We review the denial of a mistrial for an abuse of discretion. *See Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999).

"The voir dire process is designed to insure that an 'intelligent, alert, disinterested, impartial, and truthful jury will perform the duty assigned to it.'" *Brown v. State*, 183 S.W.3d 728, 737 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (quoting *Armstrong v. State*, 897 S.W.2d 361, 363 (Tex. Crim. App. 1995)).

When a juror withholds material information in the voir dire process, the parties are denied the opportunity to exercise their challenges, thus hampering their selection of a disinterested and impartial jury. *Armstrong*, 897 S.W.2d at 363. However, defense counsel bears the burden to ask questions to determine a juror's potential bias. *Id.* at 363–64. Defense counsel must also ask specific questions, and cannot rely on broad ones, to satisfy this due diligence obligation. *Gonzales v. State*, 3 S.W.3d 915, 917 (Tex. Crim. App. 1999) (citing *Brandon v. State*, 599 S.W.2d 567, 578 (Tex. Crim. App. 1979)). "Unless defense counsel asks [questions designed to illicit information that might indicate a juror's inability to be impartial and truthful], the material information which a juror fails to disclose is not really 'withheld.'" *Armstrong*, 897 S.W.2d at 363–64 (quoting *Jones v. State*, 596 S.W.2d 134, 137 (Tex. Crim. App. [Panel Op.] 1980)).

**B.   Analysis**

The State argues that the trial court did not err by denying appellant's motion for mistrial because: (1) appellant did not exercise due diligence because he never asked the venire panel if they knew the detective during jury selection; and (2) appellant did not show that the information was material.

Appellant argues that his counsel spent a significant amount of time questioning the panel about their relationships with law enforcement and that at least

seventeen panel members responded. He further contends that, despite this line of inquiry, neither juror disclosed his relationship to the detective.

The problem with appellant's argument is that his questions were not designed to elicit the information he now claims was withheld. All of the disclosures of the jurors' relationships with law enforcement were in response to defense counsel's inquiry whether anyone on the panel had a close family member who "work[ed] for the police department." Counsel later expanded the inquiry to also include close relatives working in other law enforcement agencies, such as the FBI. Notably, counsel never expanded her question to include non-familial relationships, like the ones in this case. Moreover, neither she nor anyone else mentioned Detective Mendenhall by name during voir dire.

After reviewing the record, we conclude that defense counsel did not ask questions that were calculated to uncover the jurors' non-familial relationships with Detective Mendenhall. *See Webb v. State*, 232 S.W.3d 109, 113 (Tex. Crim. App. 2007) (noting that "it is incumbent upon counsel to specifically ask questions which will determine whether they have a right to challenge the venire member"); *Armstrong*, 897 S.W.2d at 363–64 (stating that "defense counsel has an obligation to ask questions calculated to bring out that information which might be said to indicate a juror's inability to be impartial and truthful"). Accordingly, we hold that the trial court did not err by denying appellant's motion for mistrial because

14

appellant's counsel did not make a further inquiry in her questioning of the venire, and, therefore, Jurors Nos. 1 and 6 did not withhold information during voir dire. *See Armstrong*, 897 S.W.2d at 363–64 (stating that when defense counsel does not exercise due diligence, "the material information which a juror fails to disclose is not really 'withheld.'")

Furthermore, even if appellant's counsel had asked questions designed to illicit the information that appellant argues was withheld in this case, the trial court would not have erred by denying appellant's motion for mistrial because the information was not material. The record reflects that Detective Mendenhall's wife's sister was a friend of Juror No. 6, and that the detective and juror had only seen each other on occasion at social events. Juror No. 6 testified that he did not go to the detective's house, and did not otherwise have a close relationship with the detective. The record also reflects that Detective Mendenhall worked security on four or five occasions at the convenience store where Juror No. 1 was employed. Detective Mendenhall and Juror No. 1 never spoke at length, and the detective had not worked at the store within the prior two months. Both jurors testified that their relationships with the detective would not influence their assessment of the detective's credibility, and that they believed that they could be fair and impartial jurors in the case. This case is analogous to other cases involving distant relationships or connections that have been deemed nonmaterial. *See Decker v. State*, 717 S.W.2d 903, 906–08 (Tex.

15

Crim. App. 1983) (holding information that juror and victim had been co-workers for nine months, but had only met "seven, eight times" was not material); *see also Scott v. State*, 419 S.W.3d 698, 701–02 (Tex. App.—Texarkana 2013, no pet.) (holding information that juror and key prosecution witness were employed by same employer in different departments was not material); *Lopez v. State*, 261 S.W.3d 103, 108 (Tex. App.—San Antonio 2008, pet. ref'd) (holding that withheld facts that witness was friend of juror's girlfriend's stepfather and that juror had seen witness at social gathering deemed immaterial when juror, after equivocating, stated he would be fair; not material because facts failed to show potential for bias or prejudice).

We overrule appellant's first issue.

## Charge Error

In his second and third issues, appellant argues that the trial court erred in both cases (trial court cause numbers 13CR3370 and 13CR3371) by failing to instruct the jury that it must unanimously find that a single incident of the charged offense was proven beyond a reasonable doubt. Appellant acknowledges that because he did not object to the charge in trial court cause numbers 13CR3370 and 13CR3371, the trial court's error is subject to egregious harm analysis.[2]

---

[2] The record also reflects that appellant did not move to have the State elect a specific criminal act that it was relying upon for conviction. *Cosio v. State*, 353 S.W.3d 766, 775 (Tex. Crim. App. 2011). However, the trial court is responsible for ensuring

## A.    Standard of Review

We review a claim of jury charge error using a two-step process. *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013). First, we determine whether error exists in the jury charge. *Id.* Second, if error exists, we determine whether sufficient harm was caused by that error to require reversal. *Id.*; *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005).

## B.    Applicable Law

Texas law requires that a jury reach a unanimous verdict about the specific crime the defendant committed. *Cosio v. State*, 353 S.W.3d 766, 771 (Tex. Crim. App. 2011). This means that the jury must agree upon a single and discrete incident that would constitute the commission of the offense alleged. *Id.* Non-unanimity may result "when the jury charge fails to properly instruct the jury, based on the indicted offense(s) and specific evidence in the case, that its verdict must be unanimous." *Id.* Specifically, a non-unanimous verdict can occur when the State charges one offense and presents evidence that the defendant committed that offense on multiple separate occasions. *Id.* at 771–72; *Gomez v. State*, 498 S.W.3d 691, 695 (Tex. App.—Houston [1st Dist.] 2016, no pet.). A charge that allows for a non-unanimous verdict in such cases contains error. *See, e.g.*, *Cosio*, 353 S.W.3d at 774 (holding charge

unanimity in the jury charge, regardless of whether the defendant moves for an election or objects to the charge. *Id.* at 776.

contained error when charge did not instruct jury that it must reach unanimous verdict as to which specific criminal act defendant committed).

## C. Analysis

Appellant was charged with two counts of aggravated sexual assault of a child under fourteen years of age—one charge alleged anal penetration by appellant's sexual organ,[3] and the second charge alleged oral penetration by appellant's sexual organ.[4] At trial, the State presented evidence of multiple instances of both anal and oral penetration, with each instance allegedly occurring on different dates. Neither charge instructed the jury that its verdict must be unanimous, i.e., that it must agree upon a single and discrete incident that would constitute the commission of the offense alleged. In light of the evidence presented of multiple instances of both anal and oral penetration allegedly occurring on different dates, the omission of unanimity instructions in both charges allowed for the possibility of non-unanimous verdicts. Accordingly, we hold that—as the State concedes—the omission of unanimity instructions in both charges was erroneous. *See, e.g.*, *Cosio*, 353 S.W.3d at 774.

---

[3] TEX. PENAL CODE ANN. §§ 22.021(a)(1)(B)(i), (a)(2)(B).

[4] TEX. PENAL CODE ANN. §§ 22.021(a)(1)(B)(ii), (a)(2)(B).

**D.     Harm**

When, as in this case, a defendant does not object to an erroneous jury charge, reversal is required if the error results in egregious harm. *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015). "Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Id.* (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)). An egregious harm determination must be based on a finding of actual rather than theoretical harm. *See Cosio*, 353 S.W.3d at 771. Actual harm is established when the erroneous jury instruction affected "the very basis of the case," "deprive[d] the defendant of a valuable right," or "vitally affect[ed] a defensive theory." *Id.* (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)); *see also Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015). The reviewing court's egregious harm analysis takes into account the entire jury charge, the state of the evidence, including contested issues and the weight of the probative evidence, the argument of counsel, and any other relevant information revealed by the trial record as a whole. *See Villarreal*, 453 S.W.3d at 433.

The Court of Criminal Appeals opinion in *Arrington* is instructive with regard to whether egregious harm occurs when a trial court fails to include a unanimity instruction in a jury charge. Although the defendant in *Arrington* was charged with several different sexual offenses, the charge did not require the jurors to be

19

unanimous as to which separate criminal act constituted each count. *Id.* at 837–38. The Court concluded that the entirety of the charge weighed in favor of egregious harm in that case because "the entire charge did not apprise the jury of the proper unanimity requirement." *Id.* at 841.

The Court also concluded that the state of the evidence weighed against a finding of egregious harm, in part, because the jury's findings of guilt turned upon its evaluation of witness credibility. *See id.* at 844. As in this case, there was no medical or DNA evidence corroborating the complainant's claims in *Arrington* and the only evidence of the offenses came from the testimony of the complainant, the outcry witness, and the State's other witnesses. *See id.* at 841. The defendant in *Arrington*, like appellant, advanced an "all-or-nothing" defense at trial, categorically denying all of the complainant's accusations of abuse. *Cf. id.* at 842. Concluding that the state of the evidence weighed against a finding of egregious harm, the Court reasoned that, had the jury "believed [the defendant] rather than [the complainant], it would have acquitted [the defendant] of all charges." *Id.* at 844.

Relying upon *Cosio* and *Ngo*, the *Arrington* court concluded that the parties' arguments did not weigh in favor of or against a finding of egregious harm when the parties did not exacerbate or ameliorate the charge error by arguing to the jury that unanimity was (or was not) required. *See Arrington*, 451 S.W.3d at 844 (citing *Cosio*, 353 S.W.3d at 777; *Ngo*, 175 S.W.3d at 752). In *Cosio*, the Court of Criminal

Appeals concluded that the parties' arguments did not weigh in favor of egregious harm because neither the parties nor the trial court added to the charge error by telling the jury it did not have to be unanimous. In contrast, the *Ngo* court determined that this factor did weigh in favor of egregious harm because "the jury was affirmatively told, on three occasions, twice by the prosecutor and once by the trial judge, that it need not return a unanimous verdict." *Ngo*, 175 S.W.3d at 752.

With respect to the final factor—other relevant information in the record—the *Arrington* court concluded that this factor did not weigh in favor of egregious harm because there was no indication in the record that "any of the jurors were less than unanimous on all of the . . . incidents." 451 S.W.3d at 845.

### 1. Entirety of the Charge

The first factor we consider when evaluating whether charge error resulted in egregious harm is the jury charge itself. In this case, the State charged appellant with two counts of aggravated sexual assault of a child under the age of fourteen years—one charge alleged anal penetration by appellant's sexual organ, and the second charge alleged oral penetration by appellant's sexual organ. Nothing in either charge mitigated the risk of non-unanimous verdicts. Because the jury charges permitted non-unanimous verdicts based on the evidence presented in the case regarding multiple instances of abuse and nothing in the charges mitigated this conclusion, we conclude that this factor weighs in favor of finding of egregious harm. *See Arrington*,

21

451 S.W.3d at 841 (concluding that entirety of charge weighed in favor of egregious harm when "charge did not apprise the jury of the proper unanimity requirement").

## 2. The State of the Evidence

The second factor we must consider is the state of the evidence. As in *Arrington*, there was no medical or DNA evidence that corroborated J.S.'s allegations of abuse. Thus, the sole evidence of the assaults came from J.S., his mother (the outcry witness), the SANE who examined him, the SANE's director who explained the meaning of the SANE's report and findings, and the forensic interviewer who questioned J.S. about the assaults.

Specifically, J.S. testified that appellant sexually assaulted him three or four times. He also graphically explained how appellant orally and anally assaulted him and then he used a doll to demonstrate the anal sexual assault for the jury. J.S. did not testify as to when each assault occurred. J.S.'s mother, the outcry witness, testified that J.S. told her that appellant "stuck his wee-wee in [J.S.'s] butt" and "white stuff came out," and that appellant stuck his "wee-wee" in J.S.'s mouth. She also testified that J.S. told her that this occurred on Thursday, November 14, 2013. Although the SANE and the forensic interviewer corroborated J.S.'s testimony regarding most of the details of the assaults, the SANE testified that J.S. told her that appellant had anally penetrated him with his penis and that appellant "sometimes"

22

made him taste his "wee-wee" and that this occurred on Thursday and Friday, November 14th and 15th.

Although appellant did not testify, his explanation for J.S.'s allegations was provided to the jury through the admission of appellant's videotaped interview with Detective Mendenhall. In that interview, appellant denied ever sexually assaulting J.S. and claimed that J.S. was either confused or lying when he claimed otherwise. Appellant also volunteered an alternate theory that J.S. had misunderstood a pedophilia parody video that appellant had been watching and discussing with his friend on his phone. However, this theory was directly refuted by appellant's friend at trial. Appellant also called three witnesses who challenged J.S.'s credibility. Two of appellant's witnesses also testified that if anything had occurred in the apartment they shared with appellant, they would have heard it. Thus, appellant's defensive "trial strategy left the jury with an all-or-nothing decision when evaluating each count in the charge . . . either he was guilty . . . or he was not." *Ruiz v. State*, 272 S.W.3d 819, 826–27 (Tex. App.—Austin 2008, no pet.).

Appellant argues that the state of the evidence weighs in favor of egregious harm because J.S. testified that there were multiple assaults and he was not specific about the separate incidents. However, as in *Arrington*, the jury was presented with two opposing narratives in this case—J.S.'s story, and appellant's claim that he never sexually assaulted J.S. Had the jury believed appellant's version of events

23

over J.S.'s testimony, the jury "would have acquitted [appellant] of all charges." *Arrington*, 451 S.W.3d at 844; *see also Ruiz*, 272 S.W.3d at 826 (holding that, in light of defendant's all-or-nothing defense, evidence did not weigh in favor of egregious harm although complainant testified that defendant abused her for five years and she described different instances of abuse).

Appellant further argues that the state of the evidence weighs in favor of egregious harm because members of the jury disagreed during deliberations as to whether J.S. testified about oral penetration, and there is conflicting testimony regarding whether the assaults occurred on Thursday or Friday. The state of the evidence can weigh against a finding of egregious harm, however, when the record contains conflicting testimony or contested issues. *See Gomez*, 498 S.W.3d at 697. Even if members of the jury had decided that J.S. did not testify about any instances of oral penetration, there was testimony from the outcry witness regarding this conduct. *Cf. Eubanks v. State*, 326 S.W.3d 231, 241 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (stating that uncorroborated testimony of outcry witness can be sufficient evidence to support conviction). Furthermore, despite any earlier disputes regarding whether J.S. testified that any oral penetration occurred, the "evidence ultimately persuaded the members of the jury to find that [appellant] did commit the offense beyond a reasonable doubt on at least one occasion, or they would have acquitted him." *Gomez*, 498 S.W.3d at 697.

With regard to the conflicting testimony regarding whether the assaults occurred on Thursday, November 14th, or Friday, November 15th, we note that the application paragraphs in both charges authorized the jury to convict appellant if they found that the charged offense occurred "on or about" Thursday, November 14, 2013. The charges also correctly instructed the jury that the phrase "on or about" meant any time prior to the presentment of the indictment that is within the applicable statute of limitations period. *See Sledge v. State*, 953 S.W.2d 253, 256 (Tex. Crim. App. 1997).

After reviewing the evidence from appellant's trial, we conclude that the second factor does not weigh in favor of a finding of egregious harm.

### 3. Arguments of Counsel

The third factor we must consider pertains to the arguments of counsel. During closing arguments, the State explained to the jury that there were two charges in this case because there were "two separate sexual assaults. I mean, it happened numerous times; but he was orally sexual assaulted and he was anally sexually assaulted." Defense counsel suggested that J.S.'s allegations were the product of his mother's coaching and that the State had not met its burden of proof in light of the lack of medical and DNA evidence. The State's rebuttal argument focused on a "particular" night when appellant told J.S. to pull his pants and underwear down and then he both anally penetrated the boy until white stuff came out and made the boy put his penis

25

in his mouth and suck it. Neither the State nor the defense, however, "told the jurors that they must be unanimous about which criminal episode constituted each offense, nor were they told that they need not be unanimous." *Arrington*, 451 S.W.3d at 844. After considering the arguments of the parties, we conclude that the parties did not exacerbate or ameliorate the charge error by arguing to the jury that unanimity was (or was not) required, and therefore, this factor is neutral with respect to a finding of egregious harm. *Id.*

### 4. Other Relevant Information in the Record

With regard to the final factor—other relevant information in the record—appellant contends that statements made by the State and the trial court during voir dire compounded the error by suggesting that the State only had to prove "generally" that appellant was guilty of the alleged offenses. The trial court's comments that appellant relies upon, however, do no more than list the elements of each charge. Appellant also takes issue with the State's comment that "What we have to prove is that this happened sometime before we indicted the case, and that's essentially kind of where we're at." The record reflects, however, that the State's comment was regarding the statute of limitations. Neither of these statements, however, suggested to the venire that it would not be required to unanimously base each of its verdicts on a single offense.

After reviewing the entirety of the record, including the statements identified by appellant, we conclude that there is no additional relevant evidence that the jurors were less than unanimous in their verdicts. Therefore, the fourth factor weighs neither in favor of or against a finding of egregious harm.

### 5. Conclusion of Harm Analysis

Only one of the four factors—the entirety of the charge—weighs in favor of a finding of egregious harm. One factor weighs against a finding of egregious harm, and two factors are neutral. In light of our analysis of these four factors, and after reviewing the appellate record in its entirety, we cannot say that appellant was actually harmed by the charge errors because the instructions did not affect the basis of appellant's case or his defensive theories, or deprive appellant of a valuable right. *See Arrington*, 451 S.W.3d at 839–40; *Almanza*, 686 S.W.2d at 171. Accordingly, we hold that appellant was not egregiously harmed by the erroneous instructions. *See Arrington*, 451 S.W.3d at 845 (holding defendant not egregiously harmed by charge that omitted unanimity instruction when entirety of charge was only factor weighing in favor of egregious harm); *Cosio*, 353 S.W.3d at 777–78 (same). We overrule appellant's second and third issues.

## Conclusion

We affirm the trial court's judgment.

Russell Lloyd
Justice

Panel consists of Justices Keyes, Higley, and Lloyd.

Publish.   TEX. R. APP. P. 47.2(b).