**Opinion issued May 16, 2019**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-17-00815-CR

—————————————

**JOSE ANTONIO RIOS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 300th District Court
Brazoria County, Texas
Trial Court Case No. 79523-CR

## MEMORANDUM OPINION

Jose Rios was convicted of murder and sentenced to 99 years' confinement. *See* TEX. PENAL CODE § 19.02. On appeal, Rios contends that (1) the evidence was legally insufficient to support his conviction either as the principal or as a party to the murder, (2) the trial court erred in denying his motion to suppress his two

custodial statements, and (3) the trial court erred in refusing to include certain language in a jury-charge instruction pertaining to his custodial statements.

We affirm.

## Background

Jose Rios was convicted of murder for his role in an armed robbery in which Marc Rodriguez was shot and beaten to death at his apartment in Clute, Texas. When questioned by the police, a witness who was in the apartment at the time of the murder, Dominiquee Bryan, stated that the murder was committed by three men, one white and two Hispanic. And as the investigation was underway, the police received an anonymous tip identifying three men—one white and two Hispanic—as potential suspects: Royce Wood, Evaristo Meza, and Jose Rios.

When he learned that the police were searching for him, Rios voluntarily appeared at the police station. There, he gave a non-custodial statement, alleging that Wood, Meza, and he went to Rodriguez's apartment to buy drugs and that, when they arrived, Rodriguez pulled a gun on them, tried to rob them, and then shot himself in the head.

Rios was then arrested and proceeded to give two custodial statements. In the first, Rios again stated that Rodriguez had tried to rob them and then shot himself, but Rios also admitted that he had punched and kicked Rodriguez in the head during the altercation. In the second—given after Rios was shown

2

incriminating evidence found at his house—Rios admitted that the three men arrived at the apartment to rob Rodriguez and that, when Rodriguez opened the door, Rios proceeded to punch him, kick him, and beat him with a bat.

Rios was indicted for murder. After a failed attempt to suppress his three statements, Rios was tried, convicted, and sentenced.

### Rodriguez is murdered during a home invasion

On the evening of July 26, 2016, around 8:00 p.m., Dominiquee Bryan was let into the apartment of his friend, Marc Rodriguez. Rodriguez was unemployed and known to sell synthetic marijuana from his apartment. Once inside, Bryan smoked synthetic marijuana with Rodriguez and fell asleep in an armchair in the living room.

Bryan was abruptly awoken about an hour-and-a-half later, when he was struck on side of the head with some sort of object and then saw, standing over him, a Hispanic male with facial hair (later identified as Rios), holding a wooden club.

Across the room, Bryan saw two other men—a Hispanic male with long hair (later identified as Meza) and a white male with short hair (later identified as Wood)—wrestling with Rodriguez for control over a silver handgun. As the three men struggled for the gun, Rios stood guard over Bryan. Meza ultimately gained

3

possession of the handgun and shot Rodriguez. Bryan stood up and tried to intervene, and Meza shot him in the neck, knocking him back into the armchair.

Rios left Bryan where he fell, and all three intruders then turned on Rodriguez, punching and kicking him as he lay on the floor, yelling, "Where is it at?" Meza repeatedly pistol-whipped Rodriguez with his handgun while Rios repeatedly kicked and struck Rodriguez with the same club he had used on Bryan. Rios struck Rodriguez over the head and all over his body.

Eventually, Rodriguez got up and staggered into a bedroom, where Meza followed him. Rios handed his club to Wood, leaving him to stand over Bryan, and followed Meza into the bedroom after Rodriguez. Rios and Meza soon emerged from the bedroom, with Meza carrying several dry cleaner's bags and a shoe box. Rios, Meza, and Wood then ran out of the apartment.

A few minutes later, Bryan left the apartment and walked to the nearby residence of Rodriguez's brother, Michael Rodriguez, to get help. Bryan told Michael what had happened, and Michael called 911 and drove to Rodriguez's apartment. When Michael arrived at the apartment, he found his brother on the floor, severely beaten and bleeding from the head and abdomen.

Michael remained on the phone with the 911 operator, who dispatched officers to the apartment. When the officers arrived, they found Rodriguez lying on the floor with Michael beside him trying to stop the bleeding.

The apartment appeared ransacked. The dresser's drawers had been pulled out, clothing was strewn across the floor, and the kitchen cabinets and refrigerator were open. Blood was spattered throughout the living room and bedroom, and the walls were riddled with bullet holes.

After the officers had cleared the scene, EMS personnel entered the apartment and began treating Rodriguez. Rodriguez was transported to a Houston hospital, where he died during emergency surgery.

A medical examiner performed an autopsy. He concluded that the manner of death was homicide and the causes of death were a gunshot wound to the torso and blunt force head trauma. The medical examiner later testified that both causes of death contributed to the bleeding that killed Rodriguez.

Meanwhile, back at the apartment, the officers and crime scene investigators collected two projectiles lodged in the walls, projectile fragments near a brown recliner, a shell casing,[1] a handgun recoil spring, and several of Rodriguez's teeth.

***The police develop Rios as a suspect***

In the early morning hours of July 27, 2016, shortly after Rodriguez died, Clute Police Department Captain D. Turner and District Attorney Investigator P.

---

[1]    An officer later testified that the shell casing could have been dislodged from a handgun if the gun had been used to beat someone.

5

Gamboa interviewed Bryan at the hospital. Bryan told them what had happened at the apartment and provided a description of the three men.

Later that day, as she followed potential leads and reached out to other law enforcement agencies in the area, Turner received a phone call from an anonymous informant who provided names of three men who allegedly participated in the murder: Royce Wood, Jose Rios, and Evaristo Meza. Turner provided this information to police in the nearby City of Freeport, who confirmed that the three men were Freeport residences known to local law enforcement and provided Turner with Meza's address.

Turner then went to Meza's house, looking for the three men. Although police surveilling the Meza residence observed Rios, Wood, and Meza enter the house earlier that day, Turner did not find any of them there when she searched the house. She did, however, speak with Meza's mother, Irene Meza. Irene told Turner that Rios was Meza's cousin and that he lived with the Mezas in Freeport. She also provided Turner with Wood's address.

After Turner left, the police who had been surveilling the Meza residence seized the Mezas' trashcan, which had been put out on the curb sometime after Rios, Wood, and Meza had arrived at the house earlier that day. Inside the trashcan, the police found a shoe box, which contained a bag full of incriminating items, including two pairs of bloody jeans, three bloody shirts, a ball cap with

blood stains, a bloody hoodie, and a clown mask. The items were wet and appeared to have been soaked in bleach. Irene told the police that the trashcan contained old clothes she was throwing away.

Later that afternoon, Turner visited Wood's house. None of the suspects were there, but Turner did speak with Wood's mother, Shelley Fernandez. Turner told Fernandez that she needed to speak with Wood and asked her to contact Wood and the other two suspects, if possible. Fernandez called Turner later that day and told her that she had spoken to Wood. Turner urged Fernandez to have Wood contact the police. Turner explained that there had been "some threats out on the street" and that it would be "better" if the police found Wood before the other people who were "looking for him" did.

While Turner was on the phone with Fernandez, Meza called Turner on her other phone, which another officer answered. Meza agreed to come to the Clute police station. When Meza failed to appear, Turner and other officers went looking for him.

### Rios provides a non-custodial statement to Turner and Gamboa

Around 8:15 p.m., as Turner searched for Meza, she received a call from the dispatcher, who told her that two men had come to the police station and "wanted to talk about a homicide." Turner returned to the station to find Rios and Wood, who appeared "frazzled" and "upset." Rios and Wood briefly met with Detective

7

James McEntire and were then escorted to Turner's office. Turner verified their identities, gave them something to drink, and contacted EMS to come look at them, as each claimed to be injured.

After the paramedics had examined both men, Turner and Gamboa sat down with Rios and Wood for separate, noncustodial interviews. Although neither was in custody at that time, Turner read both of them their rights before the interviews. Specifically, Turner advised them of each right set forth by article 38.22, section 2 of the Code of Criminal Procedure, including, as relevant here, the right to terminate the interview at any time. *See* TEX. CODE CRIM. PROC. art. 38.22, § 2(a)(5). Rios and Wood both responded that they understood and waived their rights.

During his interview, Rios claimed that Wood, Meza, and he had gone to Rodriguez's apartment to buy synthetic marijuana and that, when they arrived, Rodriguez and another man tried to rob them at gunpoint, a fight ensued, and Rodriguez shot himself in the head. Wood provided a similar statement.

Turner and Gamboa completed the interviews of Rios and Wood around 10:00 p.m. Although they were free to leave, Rios and Wood remained at the police station, eating pizza in police chief's office.[2] Meanwhile, Turner requested warrants for their arrest. She obtained the warrants around 2:00 a.m. At the time,

---

[2] Turner later testified that Rios and Wood probably stayed at the police station because they were worried that there might be other people looking for them.

Rios and Wood were still at the police station. Rios and Wood were arrested and taken to the Clute City Jail.

### *Rios is arrested and magistrated*

Later that morning, around 6:20 a.m., Rios made his initial appearance before a county magistrate, the Hon. Jack Brown. Judge Brown provided Rios with a statutory magistrate's warning, which included a warning that Rios had the right to terminate an interview with a peace officer or attorney representing the State at any time. *See id.* art. 15.17(a). Rios indicated that he understood his rights and signed a form acknowledging that he had been advised of and understood his rights.

### *Rios provides two custodial statements to McEntire and Gamboa*

Around 3:30 p.m., Rios and Wood were escorted from the jail back to the police station, where McEntire and Gamboa interviewed them separately. Rios was interviewed first.

Before the interview began, McEntire advised Rios of his rights, except for his right to terminate the interview at any time. McEntire later testified that he read Rios his rights from a card that inadvertently omitted the right of a defendant to terminate a custodial interview at any time. Rios told McEntire and Gamboa that he understood and waived his rights.

Rios then proceeded to provide the same account he had provided to Turner. Rios stated that Wood, Meza, and he had gone to Rodriguez's apartment to buy synthetic marijuana, Rodriguez and another man tried to rob them in an apparent set up, a fight ensued, and Rodriguez ended up shooting himself in the head. McEntire then showed Rios the bloody clothes and clown mask found in the Meza trashcan. Rios's demeanor changed, and he admitted to punching and kicking Rodriguez multiple times during the fight. The interview then ended.

Rios was taken back to jail, and McEntire and Gamboa interviewed Wood. After the interview ended, McEntire and Gamboa were notified that Rios wanted to speak with them again. Rios was brought back from the jail and interviewed for a second time by McEntire and Gamboa in McEntire's office. The interview began around 6:00 p.m. As before, McEntire advised Rios of his rights, except for his right to terminate the interview at any time. And, as before, Rios stated that he understood and waived those rights.

Rios began the interview by admitting that his prior statement was inaccurate and intended to protect his cousin, Meza. Rios then stated that Wood, Meza, and he had gone to Rodriguez's apartment not to buy synthetic marijuana but to rob Rodriguez. Rios stated that he brought a bat, and Meza brought a handgun and wore a clown mask.

10

Rios stated that, when they arrived at Rodriguez's apartment, he walked up to the front door carrying the bat with Meza and Wood following behind him. Rios stated that he then knocked on the front door of Rodriguez's apartment and that, when Rodriguez opened the door, he struck him, knocking him back against the door. Rios admitted that he hit Rodriguez "at least a hundred times" but claimed that he only hit him once with the bat. Rios admitted to hearing gunshots during a struggle over Meza's handgun but claimed that he did not see who fired the weapon.

### *Rios's friend provides law enforcement with additional evidence*

Turner obtained a second search warrant for Meza's home. Through this search, investigators learned the identity of another individual, Daniel Herrera, who lived nearby and was known to sell and smoke synthetic marijuana with Wood, Meza, and Rios. When investigators subsequently interviewed Herrera, he admitted to disposing of evidence from Rodriguez's murder, including the handgun used in the robbery. He agreed to take the officers to the area where he discarded the evidence. The police recovered a towel, a bandana, and a .22 caliber handgun, which was badly damaged and missing its grip.

### *Rios moves to suppress his statements*

Rios was indicted for murder. He moved to suppress his three statements, arguing that the statements were inadmissible because he failed to receive proper

warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966), and article 38.22 of the Code of Criminal Procedure. The trial court held a hearing. Three witnesses testified: Judge Brown, Turner, and McEntire. At the end of the hearing, the trial court denied Rios's motion. The trial court found that Rios's first statement was not the result of a custodial interview and that, in any event, Turner provided a proper warning under *Miranda* and article 38.22 before beginning the interview. The trial court further found that Rios's second and third statements were the result of custodial interviews and that McEntire failed to advise Rios of his right to terminate before beginning each interview. But the trial court also found that McEntire's warnings "substantially complied" with *Miranda* and article 38.22 because the warnings provided by Turner were still in effect.

The case went to trial. The jury found Rios guilty and assessed punishment at 99 years' confinement. The trial court entered judgment in accordance with the jury's verdict. Rios appeals.

## Sufficiency of Evidence

In his first two issues, Rios contends that the evidence is insufficient to show that he acted as a principal or a party to Rodriguez's murder. Rios argues that the evidence is insufficient to show that he acted as a principal because he did not shoot Rodriguez, he did not pistol-whip Rodriguez, and the medical examiner testified that he did not know if blunt force alone could have caused Rodriguez's

12

death. Rios argues that the evidence is insufficient that show that he acted as a party because Detective McEntire never established whether Rios knew Meza's gun was loaded. And, without evidence that he knew Meza's gun was loaded, Rios argues, the State has only shown that Rios was a party to an aggravated robbery, not a murder. The State responds that it is undisputed that Rios was an active participant in an armed home invasion and robbery that resulted in the victim's death, which is legally sufficient to show he is guilty of murder either as a principal or as a party.

## A.    Applicable law and standard of review

As charged in this case, a person commits the offense of murder if he (1) intentionally or knowingly causes the death of an individual or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE § 19.02(b)(1), (2). A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

The Penal Code provides that a person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce

the result and the conduct of the actor clearly insufficient. *Id.* § 6.04(a). Thus, to convict a defendant of murder, but-for causation must be established between the defendant's conduct and the complainant's death. *See id.*; *Wooten v. State*, 267 S.W.3d 289, 296 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd).

When, as here, concurrent causes are present, the "but for" requirement is satisfied when either (1) the defendant's conduct is sufficient by itself to have caused the death or (2) the defendant's conduct coupled with another cause is sufficient to have caused the death. *See Wooten*, 267 S.W.3d at 296. If an additional cause other than the defendant's conduct is clearly sufficient by itself to have caused the death, and the defendant's conduct by itself is clearly insufficient, then the defendant cannot be convicted. *Id.*

We review legal sufficiency challenges under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Fernandez v. State*, 479 S.W.3d 835, 837 (Tex. Crim. App. 2016). Under this standard, we review "the evidence in the light most favorable to the verdict and ask whether any rational fact-finder could have found the elements of the charged offense beyond a reasonable doubt." *Id.* at 837–38. "If a rational fact-finder could have so found, we will not disturb the verdict on appeal." *Id.* at 838.

**B. Analysis**

The evidence is sufficient to show that Rios acted as a principal to Rodriguez's murder. Bryan testified that Rios repeatedly kicked Rodriguez and struck Rodriguez with the same club he had used on him. In his first custodial interview, Rios admitted to punching Rodriguez multiple times and kicking Rodriguez in the head while he was on the ground. And in his second custodial interview, Rios admitted that he hit Rodriguez "at least a hundred times" and struck him with the club. Thus, the evidence is sufficient to show that Rios intended to cause serious bodily injury to Rodriguez and committed acts clearly dangerous to human life—i.e., punching and kicking Rodriguez in the head and hitting Rodriguez in the head with a bat.

Further, the medical examiner testified that the manner of Rodriguez's death was homicide, and the causes of Rodriguez's death were the gunshot wound to his torso *and* blunt force head trauma. He testified that the two causes were "contributory to death" and that he could not "disentangle" one from the other. Thus, the medical examiner's testimony shows that Rodriguez's death would not have occurred but for Rio's conduct, operating concurrently with Meza's conduct. *See* TEX. PENAL CODE § 6.04(a). The testimony also shows that Rios's conduct was not clearly insufficient to cause Rodriguez's death, as the two causes conduct not be "disentangled" from one another. *See id.* Thus, the evidence is also sufficient to

15

show Rios's acts caused Rodriguez's death. *See Umoja v. State*, 965 S.W.2d 3, 6–9 (Tex. App.—Fort Worth 1997, no pet.) (holding evidence sufficient to support murder conviction when defendant and two other men beat complainant and autopsy showed that, although someone other than defendant inflicted most serious wound, each wound, including those inflicted by defendant, was factor contributing to complainant's death).

We hold that the evidence is sufficient to show that Rios intended to cause serious bodily injury to Rodriguez and committed acts clearly dangerous to human life that caused Rodriguez's death. *See* TEX. PENAL CODE § 19.02(b)(2). Therefore, we hold that the evidence is sufficient to show that Rios acted as a principal to Rodriguez's murder. Because we hold that the evidence is sufficient to show Rodriguez acted as a principal, we need not determine whether the evidence is sufficient to show Rodriguez acted as a party as well.

We overrule Rodriguez's first and second issues.

## Motion to Suppress

In his third issue, Rios contends that the trial court erred in denying his motion to suppress his two custodial statements. Rios argues that the statements are inadmissible because McEntire failed to warn Rios that he had the right to terminate the interview at any time before he began questioning. The State responds that the warnings provided to Rios by Turner during his initial, non-

16

custodial interview, and then by Judge Brown during his magistration, were still in effect when Rios was later interviewed by McEntire. And because the prior warnings were still in effect, the State argues, McEntire was not required to advise Rios of his right to terminate the interview at any time before he began Rios's two subsequent custodial interviews.

## A.    Applicable law and standard of review

Under Texas criminal law, a statement made by a defendant during a custodial interview is inadmissible unless two elements are satisfied. *Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010). First, before beginning the interview, the officer must warn the defendant of his rights. TEX. CODE CRIM. PROC. art. 38.22, §§ 2(a), 3(a)(2); *Miranda*, 384 U.S. at 444. Second, after receiving the warning, the defendant must "knowingly, intelligently, and voluntarily" waive his rights. TEX. CODE CRIM. PROC. art. 38.22, § 2(b); *see Miranda*, 384 U.S. at 444.

The warning that the defendant must be given is set forth by article 38.22, section 2, of the Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. art. 38.22, § 3(a)(2) ("No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless . . . prior to the statement but during the recording the

17

accused is given the warning in Subsection (a) of Section 2."). Section 2 requires that the defendant be warned that

> (1)    he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;
>
> (2)    any statement he makes may be used as evidence against him in court;
>
> (3)    he has the right to have a lawyer present to advise him prior to and during any questioning;
>
> (4)    if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and
>
> (5)    he has the right to terminate the interview at any time.

*Id.* art. 38.22, § 2(a).

An officer must warn a defendant of his rights and obtain a waiver before each custodial interview. *See Jones v. State*, 119 S.W.3d 766, 772 (Tex. Crim. App. 2003). However, it is unnecessary to provide another warning and obtain another waiver if the interview is merely a continuation of a prior interview for which the defendant was properly warned and waived his rights. *See Franks v. State*, 712 S.W.2d 858, 861 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd). In such a case, the warning and waiver from the initial interview carry forward to the subsequent interview. *Sloan v. State*, 418 S.W.3d 884, 890 n.5 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

To determine whether a subsequent interview is a continuation of a prior interview, courts consider, among other factors, (1) the passage of time between the two interviews, (2) whether the interviews were conducted by the same person, (3) whether the interviews related to the same offense, and (4) whether the officer who conducted the subsequent interview asked the defendant whether he had received any earlier warnings, whether he remembered those warnings, and whether he wished to waive or invoke them. *See Bible v. State*, 162 S.W.3d 234, 242 (Tex. Crim. App. 2005); *Jones*, 119 S.W.3d at 773 n.13; *Gibson v. State*, No. 14-14-00595-CR, 2018 WL 3625474, at *8 (Tex. App.—Houston [14th Dist.] July 31, 2018, no pet.) (mem. op., not designated for publication) ("In addition [to the passage of time], we are to consider whether the second interrogation was conducted by a different person; the second interrogation related to a different offense, and if the officer ever asked if he remembered those warnings or wished to waive or invoke them.").

We review a trial court's denial of a motion to suppress a statement made during a custodial interrogation under a bifurcated standard. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013); *Warren v. State*, 377 S.W.3d 9, 15 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). We review the trial court's factual findings for an abuse of discretion, affording almost total deference to the trial court's rulings on questions of historical fact and mixed questions of law and

19

fact that turn on an evaluation of credibility and demeanor. *Turrubiate*, 399 S.W.3d at 150; *Warren*, 377 S.W.3d at 15. We review de novo the trial court's rulings on questions of law and mixed questions of law and fact that do not turn on evaluation of credibility and demeanor. *Turrubiate*, 399 S.W.3d at 150; *Warrant* 377 S.W.3d at 15.

If the trial court makes express factual findings, we view the evidence in the light most favorable to the ruling and determine whether the evidence supports the findings. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). We will sustain the trial court's ruling if that ruling is "reasonably supported by the record and is correct on any theory of law applicable to the case." *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

## B.     Analysis

Here, it is undisputed that, before he began Rios's two custodial interviews, McEntire warned Rios of all his rights except one—the right to terminate the interview at any time. *See* TEX. CODE CRIM. PROC. art. 38.22, § 2(a)(5). The trial court nevertheless found that Rios's two custodial statements were admissible because the warnings provided by Turner before Rios's initial, non-custodial interview—which included a warning that Rios had the right to terminate the

interview at any time—were still in effect when McEntire interviewed Rios less than 24 hours later.[3]

To determine whether Turner's initial warnings were still in effect when Rios gave his custodial statements to McEntire, we consider (1) the passage of time, (2) whether the interviews were conducted by the same person, (3) whether the interviews related to the same offense, and (4) whether the interrogating officer asked Rios if he had received any earlier warnings, whether he remembered those warnings, and whether he wished to waive or invoke them. *See Bible*, 162 S.W.3d at 242; *Jones*, 119 S.W.3d at 773 n.13; *Gibson*, 2018 WL 3625474, at *8.

**The passage of time**. Turner provided her warning to Rios on the evening of July 27, 2016, around 8:45 p.m. Judge Brown magistrated Rios the following morning at 6:20 a.m. And McEntire began his first custodial interview that afternoon at 3:30 p.m. Thus, McEntire's first custodial interview began roughly 19 hours after Turner's initial warning and nine hours after Judge Brown's magistration warning.

---

[3]     Although the trial court expressly found that McEntire's warnings "substantially complied" with *Miranda* and article 38.22, the trial court based its findings on the fact that Turner had given a complete warning shortly before McEntire's incomplete warning. We therefore construe the trial court as finding that Turner's warnings were still in effect and carried forward to Rios's subsequent interviews with McEntire.

21

**Whether the interviews were conducted by the same person**. The initial non-custodial interview was conducted by Turner and Gamboa, whereas the two subsequent custodial interviews were conducted by McEntire and Gamboa. Although Gamboa helped conduct each interview, he did not provide the warnings and did not act as the principal interviewer.

**Whether the interviews related to the same offense**. All three interviews related to the same offense—the murder of Rodriguez.

**Whether McEntire reminded Rios of his prior warnings**. McEntire did not expressly remind Rios of the prior warnings provided by Turner and Judge Brown, but he did provide Rios with new warnings. Although McEntire failed to advise Rios of his right to terminate the interviews at any time, McEntire's warnings arguably served as a reminder of the previous warnings provided by Turner and Judge Brown.

Considering the totality of these four factors, we hold that the trial court did not err in ruling that Turner's initial warning carried forward and was still in effect during Rios's subsequent custodial interviews with McEntire. *See Bible*, 162 S.W.3d at 241–42 (holding that two interrogation sessions less than three hours from beginning to beginning were part of single interview, despite fact that different officers conducted questioning during each session and each session focused on different set of crimes, when same officers were present during both

22

sessions); *Jones*, 119 S.W.3d at 773 n.13 (noting that "'the mere passage of time' does not, by itself, automatically obviate prior *Miranda* warnings" and suggesting that subsequent interrogation occurring several days after receipt of *Miranda* warnings would have been constitutional if interrogation had been conducted by same officer regarding same crime); *Sloan*, 418 S.W.3d at 890 n.5 (holding that proper warnings given during first interrogation "carried forward" to second interrogation conducted five days later by same officers on same subject matter); *Miller v. State*, 196 S.W.3d 256, 266–67 (Tex. App.—Fort Worth 2006, pet. ref'd) (holding that lapse of four days between time *Miranda* warnings were given and statement was made did not render warnings ineffective when defendant met with officer who had given him warnings on both occasions and questioning dealt with same subject on each occasion); *Stiles v. State*, 927 S.W.2d 723, 729–30 (Tex. App.—Waco 1996, no pet.) (recognizing that where defendant was read statutory *Miranda* warnings at least twice before giving statements to police, whether police subsequently read warnings to defendant again each time he was interrogated was irrelevant); *see also Allridge v. State*, 762 S.W.2d 146, 157–58 (Tex. Crim. App. 1988) (holding that statement was not admitted in violation of statute specifying warnings to be given before custodial interrogation, though defendant was not given warnings before interrogation to which statement related, when he had been given warnings several other times since arrest and was given

warnings after making statement but before reading and signing it); *Babcock v. State*, 473 S.W.2d 941, 943 (Tex. Crim. App. 1971) (holding that lapse of two days between magistrate's warning and defendant's confession did not render confession inadmissible).

Accordingly, we overrule Rios's third issue.

## Jury Charge

In his fourth issue, Rios contends that the trial court erred in denying his request to include certain language in a jury charge instruction on the voluntariness of his custodial statements. The instruction submitted to the jury read as follows:

> Before a statement made orally to officers may be considered voluntary, it must be shown beyond a reasonable doubt that, prior to making such oral statement, the accused has been warned by the person to whom the statement is made, or by a magistrate, of [his rights set forth in article 38.22, section 2].

Rios requested that the trial court submit a version of the instruction that included the following language (emphasized by us):

> Before a statement made orally to officers may be considered voluntary, it must be shown beyond a reasonable doubt that, prior to making such oral statement, *but during the recording thereof,* the accused has been warned by the person to whom the statement is made, or by a magistrate, of [his rights set forth in article 38.22, section 2].

Rios argues that he was entitled to the submission of an instruction with the requested language because such language more closely tracks article 38.22, section 3 of the Code of Criminal Procedure, which provides, in relevant part:

24

No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless . . . prior to the statement *but during the recording* the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning.

TEX. CODE CRIM. PROC. art. 38.22, § 3(a)(2) (emphasis added).

## A.    Applicable law and standard of review

Under the Code of Criminal Procedure, the trial court must "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. art. 36.14. "The purpose of the jury charge is to inform the jury of the applicable law and guide them in its application to the case." *Hutch v. State*, 922 S.W.2d 166, 170 (Tex. Crim. App. 1996).

Article 38.22 establishes two types of jury instructions that relate to whether a jury may consider a statement made by a defendant during a custodial interrogation: (1) a voluntariness instruction under Section 6 and (2) a warnings instruction under Section 7.[4] *Oursbourn v. State*, 259 S.W.3d 159, 173 (Tex. Crim. App. 2008). Rios contends he was entitled to the latter type of instruction—a warnings instruction under Section 7.

---

[4]    Under article 38.23, there is a third type of instruction—an exclusionary rule instruction—that "is a fact-based instruction that is narrowly focused on the specific tactic used to obtain a statement and whether that tactic was illegal, thereby destroying the statement's voluntariness." *Alas v. State*, No. 01-15-00569-CR, 2016 WL 4055580, at *5 (Tex. App.—Houston [1st Dist.] July 28, 2016, no pet.) (mem. op., not designated for publication); *see* TEX. CODE CRIM. PROC. art. 38.23(a).

Section 7 states that, "When the issue is raised by the evidence, the trial judge shall appropriately instruct the jury, generally, on the law pertaining to such statement." TEX. CODE CRIM. PROC. art. 38.22, § 7. The Court of Criminal Appeals has explained that "the issue" to which Section 7 refers is the State's compliance with the statutory warnings set out in articles 15.17 and 38.22 and the voluntariness of the defendant's waiver of the rights. *Oursbourn*, 259 S.W.3d at 176. Thus, a defendant is entitled to a Section 7 warnings instruction when the issue of whether the State complied with the requirements of article 38.22 is "raised by the evidence." TEX. CODE CRIM. PROC. art. 38.22, § 7; *see Oursbourn*, 259 S.W.3d at 176.

The issue is "raised by the evidence" only if there is "a genuine factual dispute" as to whether the defendant received the proper warnings and waived his rights. *Oursbourn*, 259 S.W.3d at 176. A genuine factual dispute is created by affirmative evidence. *Rodriguez v. State*, No. 01-14-00774-CR, 2017 WL 3184744, at *8 (Tex. App.—Houston [1st Dist.] July 27, 2017, pet. ref'd) (mem. op., not designated for publication). A genuine factual dispute cannot be created by the mere argument of counsel or cross-examination questions. *Oursbourn*, 259 S.W.3d at 177; *Rodriguez*, 2017 WL 3184744, at *8.

If there is no disputed factual issue, the trial court must determine the adequacy of the warnings as a matter of law and no jury instruction is necessary.

*Rodriguez*, 2017 WL 3184744, at *8; *see Robinson v. State*, 377 S.W.3d 712, 719 (Tex. Crim. App. 2012) ("Where the issue raised by the evidence at trial does not involve controverted historical facts, but only the proper application of the law to undisputed facts, that issue is properly left to the determination of the trial court.").

In reviewing a jury-charge issue, we first determine whether error exists. *Ashton v. State*, 526 S.W.3d 490, 499 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd). If it does, then we consider harm. *Id.*

## B.  Analysis

Here, the issue raised by the evidence was whether Rios voluntarily made his two custodial statements, given that McEntire failed to warn Rios that he had the right to terminate the interviews at any time. The evidence raised this issue because the evidence showed that McEntire failed to give Rios the warnings.

The issue of whether the warnings given to Rios were recorded was not raised by the evidence. The evidence presented to the jury, including the statements themselves, showed that the warnings that Rios received were recorded. No witness testified that the warnings were not recorded. No other evidence otherwise suggested that the warnings were not recorded. And Rios never argued that the warnings were not recorded. It was thus undisputed and conclusively established that the warnings were recorded. The issue, then, was not raised by the

27

evidence. Because the issue was not raised by the evidence, Rios was not entitled to the submission of an instruction on that issue.

Accordingly, we overrule Rios's fourth issue.

## Conclusion

We affirm the trial court's judgment.

Laura Carter Higley
Justice

Panel consists of Justices Keyes, Higley, and Landau.

Do not publish. TEX. R. APP. P. 47.2(b).