**Opinion issued December 5, 2024**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-22-00776-CR
_____

**TROY E. HOLLINS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 207th District Court**
**Comal[1] County, Texas**
**Trial Court Case No. CR2020-054**

**MEMORANDUM OPINION**

---

[1]  Pursuant to its docket-equalization authority, the Supreme Court of Texas transferred this appeal from the Court of Appeals for the Third District of Texas to this Court. *See* Misc. Docket No. 22-9083 (Tex. Sept. 27, 2022); *see also* TEX. GOV'T CODE § 73.001 (authorizing transfer of cases). We researched relevant case law and did not locate any conflict between the precedent of the Court of Appeals for the Third District and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

A jury convicted appellant Troy E. Hollins of engaging in organized criminal activity, and the trial court assessed punishment at eighty years' confinement. *See* TEX. PENAL CODE § 71.02. On appeal, appellant raises five issues concerning: (1) jury charge error, (2) the denial of his motion to suppress evidence resulting from a traffic stop, (3) the admission of certain expert testimony, (4) the sufficiency of the evidence proving his identity as one of the burglars, and (5) the sufficiency of the evidence demonstrating a nexus between appellant and the locations of the burglaries. We affirm.

## Background

This case concerns a string of burglaries across Texas in March and April 2018, resulting in a complex, year-long investigation by numerous law enforcement agencies.

### *Creekside Cinemas Burglary*

New Braunfels Police Officer Randy Bryan testified that he responded to an alarm at the Creekside Cinemas at approximately 6:30 a.m. on April 18, 2018. Upon arrival, Officer Bryan and the other responding officer observed that the doors at the entrance to the building had been pried open. As they made their way through the building, officers discovered that the office had been broken into and the safe was wide open. Theater management arrived on the scene and confirmed the loss of roughly $7,000 in cash and coins.

Crime scene investigators documented the damage to the theater and signs of forced entry, including yellow paint chips on the pried-open doors and handles. Crime scene technician Ylina Bernal also observed scratches on the doors made by the suspects' tools and opined that crowbars or pry bars may have been used. Forensic Analyst Roland Penny testified concerning the surveillance footage he obtained at the scene, which was played for the jury and admitted into evidence at trial. The footage depicted four suspects wearing black clothing, gloves, and masks. The suspects' tools included three crowbars and a sledgehammer. Penny testified concerning certain identifying features of the suspect's clothing, including striped underwear on one individual.

### Traffic Stop

While the New Braunfels Police Department (NBPD) was wrapping up its investigation at the scene, Texas Department of Public Safety (DPS) Trooper Stephen Royal was stationed in Bell County, working along Interstate 35. Trooper Royal testified that on the morning of April 18, 2018, at approximately 9:01 a.m., he conducted a traffic stop of a red Chrysler 300.[2] Trooper Royal testified that the reason for the stop was an obscured license plate. As he approached the passenger side of the vehicle, he smelled a strong odor of marijuana. Trooper Royal asked the

---

[2] As discussed further below, appellant moved to suppress the evidence obtained during Trooper Royal's traffic stop. Trooper Royal testified twice—first outside the presence of the jury during the suppression hearing, and later in front of the jury after the trial court denied appellant's motion.

three occupants to exit the vehicle and proceeded to question them separately. Trooper Royal observed a large wad of money sticking out of the pocket of the driver's sweatpants. He observed a similar bulge in the pocket of the passenger's sweatpants, and the passenger (identified as appellant) informed Trooper Royal it was money. The driver (identified as Xavier Hollins) and appellant gave conflicting stories as to their reasons for carrying the cash.[3] The backseat passenger (identified as Joshua Thomas) advised Trooper Royal that a backpack in the vehicle was his.

When Thomas exited the vehicle, Trooper Royal saw marijuana fall to the floorboard of the vehicle. He also observed rolled coins sitting on the center console and clothing in the front and back seats. Trooper Royal testified that the coins appeared to have been rolled professionally. When backup arrived, Trooper Royal searched the vehicle. He found an assortment of clothing in the front and back seat, including sweatpants, hoodies, and gloves, and a pair of shoes containing more rolled coins. Trooper Royal found more cash in Thomas's backpack and more clothing in the trunk. On top of the clothing in the trunk, Trooper Royal saw a 16-pound sledgehammer and three crow bars. Trooper Royal's photos from the traffic stop demonstrate that two of the crowbars were yellow. Trooper Royal asked the

---

[3]     Trooper Royal testified that Xavier Hollins told him the group had been to strip clubs in Austin, but appellant said they were going to look at a car for sale on Craigslist in Austin.

4

group "if they were driving out of town 'hitting licks.'"[4] Trooper Royal knew from their identification that the men were from the Dallas area. According to Trooper Royal, Hollins laughed and said he had been doing concrete work for his grandmother.

On advice of the local district attorney's office, Trooper Royal documented and seized the items he discovered and then provided receipts to the individuals. He advised them that if law enforcement ultimately determined that the money (roughly $3,500) did not come from any crime, they could get it and their other belongings back. According to Trooper Royal, one or two of the men said they were not interested in collecting the items seized, which Trooper Royal thought was odd. For purposes of his inventory, Trooper Royal collected the individuals' names, addresses, and phone numbers. Thomas received a ticket for the marijuana, but no one was taken into custody, and the men were permitted to leave after a three-hour traffic stop.

### Investigation and Other Burglaries

NBPD Detective John Mahoney spearheaded the investigation. Based on surveillance footage obtained from the theater, Detective Mahoney identified a silver Honda Pilot as possibly involved in the burglary. He issued a bulletin or "BOLO"

---

[4]  Trooper Royal testified that "hitting licks" means "leaving your town, going to another town and committing burglaries, robbing ATMs, and then going back to where you're from."

(Be On the Lookout) to other law enforcement agencies, which included still frames of the surveillance footage showing the suspects, their tools, and the Honda Pilot. In response to his BOLO, Detective Mahoney learned about Trooper Royal's traffic stop and obtained Trooper Royal's photographs and dash cam footage. After reviewing this evidence, Detective Mahoney believed Xavier Hollins, appellant, and Joshua Thomas were three of his four suspects from the theater burglary. Considering the yet-to-be-identified fourth suspect, the fact that only a portion of the money was found in the traffic stop, and the Honda Pilot spotted at the scene, Detective Mahoney reasoned that this other vehicle contained more suspects and more money.

Eventually, Detective Mahoney tracked the Honda Pilot and the Chrysler 300 to a gas station along I-35. Surveillance footage there showed the two vehicles arriving at the same time on April 18 (after the burglary but before the traffic stop). From the footage taken inside the gas station, Detective Mahoney determined that the occupants of the two vehicles knew each other. He ultimately identified Thomas, Jay Elias, Keith Martin, appellant, and Christopher Lee from the gas station footage.[5]

Other law enforcement agencies responded to Detective Mahoney's BOLO. From this, Detective Mahoney learned about a burglary of a Target store in San Antonio, Texas, at approximately 4:00 a.m. on April 18, 2018—a few hours before

---

[5]     Detective Mahoney did not testify to identifying Xavier Hollins from the gas station video.

6

the theater burglary. Detective Mahoney testified that through his investigation, he began communicating with a Target loss prevention employee, Mike Ellsworth. Ellsworth had a list of burglaries at other Target stores in Texas, spanning over two months. According to Detective Mahoney, Ellsworth had already been reviewing surveillance footage from those different burglaries and had observed the same type of behavior—similarly dressed suspects using the same type of tools. Detective Mahoney testified that Ellsworth believed it was one crew or group of individuals traveling across Texas and burglarizing Target stores.

Detective Mahoney obtained surveillance footage from Ellsworth for the San Antonio Target burglary, which he compared to footage from the theater burglary. Detective Mahoney observed one of the suspects wearing a distinctive hoodie or sweater with red stripes on the front and white stripes down the sleeves—an item of clothing he observed in the Creekside Cinemas footage and in the photos of the clothing found inside the Chrysler. He also identified a silver SUV that he believed to be a Honda Pilot.

Through Ellsworth, Detective Mahoney learned of the following Target burglaries, which he began to suspect were connected to those on April 18:

- March 4, 2018 – Grand Prairie, Texas
- March 6, 2018 – Hurst, Texas
- March 15, 2018 – Houston, Texas (Northwest Freeway)

- March 19, 2018 – Houston Texas (Tomball Parkway)

- April 7, 2018 – Balcones Heights, Texas

Detective Mahoney testified about his efforts to use cell phone data to connect the suspects to the burglaries.[6] Detective Mahoney explained that he used two forms of data: information physically downloaded from certain cell phones and information obtained from cell phone providers via search warrant. Detective Mahoney testified that from a physical download, he can obtain call logs, text messages, emails, search history, photos, and possibly location information. In this case, Detective Mahoney was unable to complete a download of appellant's phone, but he was able to extract information from Xavier Hollins and Keith Martin's phones.[7] From this information, particularly text message content and call records, he determined that the suspects had been in contact with each other.

---

[6] The data, Detective Mahoney testified, was extensive. For appellant's phone number alone, Detective Mahoney and investigators analyzed a spreadsheet containing six thousand rows of text messages, phone calls, and data usage. In total, the team reviewed records for six suspects and ten phone numbers.

[7] Detective Mahoney testified that state troopers seized "a handful of phones" in this case from a vehicle the suspects were in. The phones were "the latest and greatest iPhone" with passwords or locks that Detective Mahoney did not have the technology to break. Detective Mahoney testified that he obtained a search warrant and sent the phones to a digital forensics lab run by the United States Secret Service. Detective Mahoney asked the lab to use their equipment to break into the phones. The lab successfully accessed some of the phones, but not all of them. It is unclear from Detective Mahoney's testimony whether officers did not find a phone for appellant or found one but failed to crack it.

Detective Mahoney then testified to the data obtained from the cell phone providers via search warrant. He explained how cell phones connect to cell towers based on signal strength (typically, the closest tower) and how he uses information regarding a tower's approximate coverage area to plot the tower locations on a map, based on his extensive training. Detective Mahoney testified that the software he is trained to use is more than ninety percent accurate.

Detective Mahoney showed the jury a map of appellant's phone usage as compared to the dates, times, and locations of the various burglaries, which was admitted into evidence. For example, on March 4, 2018, appellant's phone data showed his phone connected to a tower in the Dallas area around 3:18 a.m. At 3:43 a.m., appellant's phone connected to a different tower with a coverage area that included the Target location in Grand Prairie, Texas. That Target location was burglarized at 3:45 a.m. on March 4, 2018, according to surveillance footage.

Turning to the March 6 burglary in Hurst, Texas at approximately 4:26 a.m., appellant's phone showed no activity near that location in the relevant timeframe. However, at 3:04 a.m., appellant's cell phone connected to a tower near a different Target store shown on Detective Mahoney's map as north of Dallas along Interstate 75. Detective Mahoney theorized from his analysis of all the suspects' phone records

and video footage that they sometimes scoped out other Target locations before ultimately burglarizing a different location.[8]

On March 15, 2018, a Target store in Houston, Texas (Northwest Freeway) was burglarized at approximately 3:15 a.m. The night before the burglary, appellant's phone connected to a tower in the Dallas area near his home around 10:00 p.m. At 3:14 a.m., appellant's phone utilized a tower in the same area as the burglarized Target store. Immediately thereafter, the phone returned to Dallas.

On March 19, 2018, another Target burglary occurred in Houston, Texas (Tomball Parkway) at 3:12 a.m. At 3:13 a.m., Detective Mahoney's data showed appellant's phone using a tower "very near" that store location in northwest Houston.

Following a similar pattern, on April 6, 2018, at approximately 10:44 p.m., appellant's phone was connecting to towers in the South Dallas area where he lived. On April 7, 2018, a Target store in Balcones Heights, Texas was burglarized around 4:28 a.m. Appellant's phone connected to towers in that vicinity at 3:12 a.m., 3:14 a.m., and 4:37 a.m., and then returned to Dallas "immediately after."

---

[8] Detective Mahoney theorized that this is what occurred on April 18 with the Creekside Cinemas burglary. He believes the suspects drove by a Target in New Braunfels around 6:00 a.m. and observed approximately fifteen cars in front of the store because employees had arrived early for stocking. Detective Mahoney's "presumption was that the defendants [saw] that and decided, well, we can't burglarize that Target . . . . There's a movie theater right there. And broke into the movie theater."

Again, on April 17, 2018, at 7:45 p.m., appellant's phone connected to the tower "it tended to use the night before most of the burglaries," "[i]n the area of south Dallas and Duncanville." At 3:43 a.m., the phone connected to a tower in San Antonio near a Target store that was not burglarized. However, a different San Antonio Target was burglarized later that morning. Appellant's phone records showed no activity during the time of the subsequent burglary. Detective Mahoney testified that this was "consistent with the same type of behavior [he saw] as [he] analyzed the records . . . that they would sometimes go check out a Target and if it wasn't right, too many people around, they would go to a different Target." Later, around 6:18 a.m., appellant's phone connected to a tower on the north side of New Braunfels, east of I-35. Detective Mahoney testified that this connection was significant because it was near the Creekside Cinema location, which was burglarized around 6:30 a.m. that morning. By 7:36 a.m., appellant's phone was connecting to a tower in the area of the gas station where Detective Mahoney saw appellant and the other suspects on surveillance footage. At 9:36 a.m., appellant's phone connected to a tower in the area of Temple, Texas "very close" to the area where Trooper Royal conducted his traffic stop of appellant. By 2:38 p.m., appellant's phone had returned to the south Dallas area.

Detective Mahoney testified that he used this same methodology to map records for phone numbers associated with other suspects in the case and noticed a

similar pattern. Detective Mahoney acknowledged that every phone was not near every Target at or near the time of its burglary, but he was able to identify a "core group" involved in most of the burglaries. Detective Mahoney testified that the evidence showed that Hollins was part of a criminal combination with Xavier Hollins, Jay Elias, Keith Martin, Christopher Lee, and Joshua Thomas.

The jury also heard testimony from representatives of Target and Creekside Cinemas who testified to the amounts of money stolen. The jury learned that a total amount of $201,440 was stolen from the six Target locations. Another $7,144 was stolen from the Creekside Cinemas. The Creekside Cinemas representative also reviewed photographs from Trooper Royal's traffic stop and testified that the way the money appeared to be clipped, rolled, and bagged was the same or similar to how the money was kept at the theater.

Additionally, the jury heard testimony from Jeff Marshall, a supervisor with the DPS Intelligence and Counterterrorism Division, as well as the Telecommunications Research and Analysis Center. Like Detective Mahoney, Marshall mapped the cell phone towers utilized by appellant's phone as compared to the burglary locations (though he did not provide estimated coverage areas for the towers). The jury also heard testimony from a gang expert who opined that appellant is a member of 44 OGs, a Dallas-area division of the Blood gang.

Lastly, the jury heard testimony from Texas Ranger Joey Evans, who became involved in the case just days after the Creekside Cinemas burglary. Ranger Evans testified that Detective Mahoney asked the Rangers to assist with his investigation given the multiple burglaries outside of New Braunfels and across the state. Ranger Evans's testimony discussed the links between the traffic stop and the various burglaries, how the investigators identified the suspects, and the cell phone data showing communication between the various suspects around the times of the burglaries.

***Trial Proceedings***

At the conclusion of the State's case, appellant moved for directed verdict, arguing that: (1) the State failed to present any evidence of identity, (2) the State failed to establish appellant's nexus to burglaries comprising thefts totaling over $150,000, and (3) the State failed to sufficiently demonstrate Target's ownership of the ATMs. The trial court overruled appellant's motion on all three grounds.

Thereafter, the defense rested without presenting any additional evidence. Following closing arguments, the jury found appellant guilty of the felony offense of "Engaging in Organized Criminal Activity – Theft >$150,000 <$300,000" as charged in the indictment. After a hearing on punishment, the trial court signed a judgment sentencing appellant to eighty years' confinement on August 26, 2022. This appeal followed.

**Sufficiency of the Evidence**

Though briefed last, we consider appellant's fourth and fifth issues concerning the sufficiency of the evidence first because they would afford him the greatest relief. *See Campbell v. State*, 125 S.W.3d 1, 4 n.1 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (reviewing court will first address issues that, if sustained, require reversal and rendition of judgment before turning to issues seeking remand).

**A.     Standard of Review and Applicable Law**

While appellant frames his sufficiency issues as challenging the factual sufficiency of the evidence, the Texas Court of Criminal Appeals has held that a reviewing court should only apply the legal-sufficiency standard in considering whether the evidence is sufficient to support a guilty verdict. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). In making a legal sufficiency determination, the critical question is whether *any* rational jury viewing the evidence in the light most favorable to the prosecution could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks*, 323 S.W.3d at 912 (holding that all Texas criminal cases are only to be reviewed under the standard announced in *Jackson*).

Each fact need not directly and independently point to the appellant's guilt, so long as the "cumulative force" of all the incriminating circumstances sufficiently supports the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

Circumstantial evidence is equally as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to support a conviction. *Id*.

When performing a legal sufficiency review, courts may not reevaluate the weight and credibility of the evidence and substitute their own judgment for that of the jury. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012); *see also Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010) ("[O]ur role is not to become a thirteenth juror."). When faced with a record supporting contradictory inferences, we presume the jury resolved conflicts in favor of the verdict. *Montgomery*, 369 S.W.3d at 192.

A person engages in organized criminal activity "if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang, the person commits or conspires to commit one or more" of the enumerated offenses, including theft.[9] TEX. PENAL CODE § 71.02(a)(1); *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018). To prove the offense of engaging in organized criminal activity, the State must prove the underlying enumerated offense, including the requisite intent. *See Hart v. State*, 89 S.W.3d 61, 63 (Tex. Crim. App. 2002). In this case, the underlying offense was

---

[9]    The State presented evidence of appellant's participation in a criminal combination and membership in a criminal street gang. Appellant does not challenge the sufficiency of the evidence supporting either of these alternative elements on appeal. *See* TEX. PENAL CODE § 71.01(a), (d) (defining "combination" and "criminal street gang" for purposes of the statute).

aggregated theft of property totaling $150,000 or more but less than $300,000. *See* TEX. PENAL CODE §§ 31.03(e)(6)(A), 31.09.

## B.     Identity

Appellant first contends that the evidence was insufficient to establish his identity as one of the burglars. Appellant argues that (1) no eyewitnesses identified him, (2) he was never identified in court as "actively participating" in any of the burglaries, (3) there is a temporal and geographic distance between the Creekside Cinemas burglary and traffic stop, and (4) the cell phone location data does not put him inside any of the Target stores.

We disagree with appellant's characterization of the record evidence. Though no eyewitnesses identified appellant (because there were none) the jury itself saw surveillance footage from the two April 18, 2018 burglaries and dash cam footage from the traffic stop later that day. As Detective Mahoney and Ranger Evans testified and the jury observed, an individual wearing distinctive, striped underwear can be seen in all three videos. Ranger Evans identified the person wearing the striped underwear as appellant. Further, Trooper Royal identified appellant in the courtroom from the traffic stop, and Detective Mahoney identified appellant in photographs from the traffic stop and in the courtroom.

Ranger Evans testified that he identified appellant in the Creekside Cinema burglary and the San Antonio Target burglary not just by his underwear, but also

16

from "a number of things that were in the vehicle, items, tools, vehicle license plates putting people there. [Based] on a number of reasons, yes." And the jury saw Trooper Royal's photographs of these identifying items—the tools, the clothing, the money—which were admitted into evidence at trial.

As to the other Target locations, Detective Mahoney testified that even before the April 18, 2018 Target burglary, Mike Ellsworth had been doing his own investigation and had reviewed video footage from the earlier Target burglaries and was "seeing the same type of behavior from people who were dressed the same, carrying the same type of tools." Detective Mahoney also described one item of clothing in particular, a distinctive hoodie or sweater with red and white stripes collected during the traffic stop that he also observed in the Creekside Cinemas surveillance footage and later in surveillance from other Target stores across Texas. Additionally, Ranger Evans identified the perpetrators of the burglaries (including appellant) from their cell phone data revealing the perpetrators' communications with each other near the burglarized stores around the time of the burglaries.

As pointed out by the trial court[10] and acknowledged by appellant in his briefing to this court, circumstantial evidence and direct evidence are equally probative. *See McCann v. State*, 433 S.W.3d 642, 646 (Tex. App.—Houston [1st

---

[10] In denying appellant's motion for directed verdict as to identity, the trial court stated: ". . . [C]ircumstantial evidence, as you're well aware, is equally credible as direct evidence, if the jury wants to believe it. So that's what they are going to be called upon here to do, is link the circumstantial evidence."

17

Dist.] 2014, no pet.) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). Further, "[t]he identity of the alleged perpetrator may be proven by circumstantial evidence." *Jones v. State*, 458 S.W.3d 628, 630 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (quoting *Orellana v. State*, 381 S.W.3d 645, 653 (Tex. App.—San Antonio 2012, pet. ref'd) (internal quotations omitted)). It is not necessary that each fact directly and independently point to the guilt of the appellant, as long as the "cumulative force" of all the incriminating circumstances is sufficient to support his conviction. *Hooper*, 214 S.W.3d at 13.

In sum, (1) video evidence ties appellant (and his underwear) to at least two burglaries; (2) on the day of those two burglaries, appellant was pulled over in a car containing tools and clothing similar to those seen on surveillance and money clipped in a manner consistent with the money used at the burglarized theater; (3) officers testified that similar clothing and tools were seen on surveillance from the other burglaries; and (4) appellant's cell phone data places him in proximity to the burglaries, around the time of the burglaries, and in contact with other suspects around those same times. Further, appellant presented no testimony from anyone who could explain why appellant, who lived in the Dallas area, would be in the vicinity of those burglarized stores in other Texas cities in the early morning hours. It was reasonable for the jury to infer, based on the evidence presented, that appellant was one of the burglars of the Creekside Cinemas and Target stores at issue. *See*

*Jones*, 458 S.W.3d at 630–32 (concluding jury could reasonably infer appellant's identity as robber when State presented evidence connecting appellant to discarded clothing and gloves that also contained DNA profile of complainant, and no other testimony could explain connection between appellant and complainant) (citing *Roberson v. State*, 16 S.W.3d 156, 167 (Tex. App.—Austin 2000, pet. ref'd) (stating that State may establish identity by circumstantial evidence and inferences)).

Viewing the evidence in the light most favorable to the jury's verdict, we hold that the State presented sufficient evidence from which a reasonable jury could conclude beyond a reasonable doubt that appellant was one of the burglars who committed the thefts at issue.

We overrule appellant's fourth issue.

## C.    Nexus to the Crime

For similar reasons, we reject appellant's sufficiency arguments presented in his fifth issue. Appellant contends that the evidence is insufficient to establish a nexus between him and thefts totaling more than $150,000 but less than $300,000. Again, video surveillance places appellant—identified by investigators by his clothing—at the Creekside Cinemas and San Antonio Target burglaries on April 18, 2018. Though the Target representative testified that no money was actually stolen from the San Antonio Target on April 18, 2018, the Creekside Cinemas representative testified to a theft of $7,144. As to the other five burglaries,

19

appellant's cell phone data places him near the locations of four of those stores[11] around the time that each of those stores was burglarized, and in communication with other members of the criminal combination. As the State observed during closing arguments, even if the jury did not believe appellant participated in the Hurst burglary on March 6, 2018, the aggregate amount of money stolen still totaled more than $150,000 but less than $300,000.[12] Specifically, the Target representative testified to the following losses as outlined in Exhibit 108, a spreadsheet shown to the jury and admitted at trial:

| Texas Serial Burglaries Tracking Sheet | | | | | | | |
|---|---|---|---|---|---|---|---|
| Incident Date | Store | PD | LE Case # | Property Damage Target | Merchandise Loss | Cash Loss | ATM Damage |
| 3/4/2018 | T-1116 | Grand Prairie | 18-4150 | $800 | $0 | $45,420 | $6,500 |
| 3/6/2018 | T-1766 | Hurst | 2018001138 | $500 | $10,665.80 | $30,120 | $6,500 |
| 3/15/2018 | T-0858 | Houston | 326179-18 | $1,000 | $0 | $30,500 | $6,500 |
| 3/19/2018 | T-1124 | Tomball | HC180043003 | $1,420.83 | $0 | $55,100 | $6,500 |
| 4/7/2018 | T1523 | Balcones Heights | 1804888 | $8,000.00 | $0 | $40,300 | $6,500 |
| 4/18/2018 | T1979 | San Antonio | 18079714 | $5,000.00 | $0 | $0 | $6,500 |
| TOTAL | | | | $16,721 | $10,666 | $201,440 | $39,000 |

Considering the cumulative effect of the circumstantial evidence presented at trial, and viewing the evidence in the light most favorable to the verdict, as we must, we conclude that the State presented legally sufficient evidence to support an

---

[11] Detective Mahoney testified no cell phone data tied appellant to the Hurst location on March 6, 2018. However, call logs indicated appellant was in communication with other members of the combination, namely, Christopher Lee and Joshua Thomas, in the early morning hours of March 6, 2018.

[12] The amounts stolen from the other stores totals $171,320, as reflected in Exhibit 108.

aggregate theft amount of more than $150,000 but less than $300,000. *See McCann*,
433 S.W.3d at 646; *Jones*, 458 S.W.3d at 630; *Hooper*, 214 S.W.3d at 13.

We overrule appellant's fifth issue.

## Jury Charge Error

In his first issue, appellant argues that the jury charge omitted essential
elements of the charged offense, constituting fundamental error. Specifically,
appellant contends that the application paragraph of the charge failed to include the
names of the owner or special owners[13] of the money stolen and failed to include the
words "aggregate theft," "pursuant to one scheme or continuing course of conduct"
and "unlawfully appropriate, by acquiring or otherwise exercising control over
property." *See* TEX. PENAL CODE §§ 31.01(4) (defining "appropriate"), 31.09
(aggregation of amounts involved in theft).

## A. Standard of Review and Applicable Law

The purpose of the trial court's jury charge is to instruct the jurors on the law
applicable to the case. TEX. CODE CRIM. PROC. art. 36.14; *Vasquez v. State*, 389
S.W.3d 361, 366 (Tex. Crim. App. 2012). The charge is the instrument by which the
jury convicts; therefore, it must contain an accurate statement of the law and set out

---

[13] "A 'special owner' is an individual who is in custody or control of property
belonging to another person." *Garza v. State*, 344 S.W.3d 409, 412–13 (Tex. Crim.
App. 2011) (quoting *Harrell v. State*, 852 S.W.2d 521, 523 (Tex. Crim. App. 1993)).

all the essential elements of the offense. *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995).

The abstract portion of the court's charge sets forth the law in general terms for the jury, including statutory definitions and offense elements. *See Vasquez*, 389 S.W.3d at 366. The application paragraphs then apply that law to the particular facts, as limited by the indictment. *Id*. at 366–67.

A jury charge that improperly states the law or the elements of an offense is erroneous. *See Alcoser v. State*, 596 S.W.3d 320, 334 (Tex. App.—Amarillo 2019) (holding that failure to include abstract paragraph stating statutory elements of offense was error), *rev'd on other grounds*, 663 S.W.3d 160 (Tex. Crim. App. 2022); *see also Sandig v. State*, 580 S.W.2d 584, 586 (Tex. Crim. App. 1979) (holding that overly broad definition of "sexual contact" in abstract instruction was reversible error).

Likewise, a jury charge with an application paragraph that incorrectly applies the pertinent law to the facts of a given case is erroneous. *Cortez v. State*, 469 S.W.3d 593, 598 (Tex. Crim. App. 2015); *Gray v. State*, 152 S.W.3d 125, 127–28 (Tex. Crim. App. 2004).

There are two standards of review for claims of jury-charge error. *Alcoser*, 663 S.W.3d at 165 (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g)). When a defendant timely objects to alleged jury-charge error,

the record need only show "some harm" to obtain relief. *Id*. When, as here, no objection was made, the record must show "egregious harm." *Id*. Harm is assessed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel, as well as any other relevant information revealed by the trial record as a whole. *Id*. Neither party bears the burden to show harm. *Id*. (citing *Marshall v. State*, 479 S.W.3d 840, 842–43 (Tex. Crim. App. 2016)).

## B.     The Indictment and the Court's Charge

We begin our analysis by comparing the language in the indictment with that in the court's charge. The indictment alleged as follows:

> THE GRAND JURORS, duly selected, organized, sworn and empaneled as such for the County of Comal, State of Texas, at the January term, A.D., 2020, of the 207TH Judicial District Court for said County, upon their oaths present in and to said Court that in the county and state aforesaid, and before the presentment of this indictment, **TROY EMMANUELL HOLLINS**, hereinafter styled Defendant, with intent to establish, maintain or participate in a combination, to-wit: Xavier Hollins, Troy Hollins, Joshua Thomas, Keith Martin, Jay Elia, Christopher Lee and a person or persons unknown, or in the profits of a combination, did then and there commit the offense of aggregate theft, to-wit: pursuant to one scheme or continuing course of conduct in multiple counties in the State of Texas to include Comal County, Texas, beginning on or about the 4th day of March, 2018, and continuing through on or about the 18th day of April, 2018, unlawfully appropriate, by acquiring or otherwise exercising control over property, to-wit: United States currency, from Mike Ellsworth, owner or special owner for Target, and from Marie Engelhardt, owner or special owner for Creekside Cinema, without effective consent of the owner, with intent

to deprive the owner of said property, and the aggregate value of the property appropriated was $150,000 or more but less than $300,000.[14]

By contrast, the application paragraph of the court's charge read as follows:

> Now bearing in mind the foregoing instructions, if you unanimously believe from the evidence beyond a reasonable doubt, that the Defendant, TROY HOLLINS, beginning on or about March 4, 2018 and continuing through April 18, 2018, in multiple counties including the County of Comal, and State of Texas, as alleged in the indictment, with the intent to establish, maintain, or participate in a combination to wit: Xavier Hollins, Joshua Thomas, Keith Martin, Jay Elia, Christopher Lee, and a person or persons unknown, or as a member of a criminal street gang, TROY HOLLINS did then and there commit the offense of Theft >$150,000 <$300,000, then you will find the Defendant, TROY HOLLINS, "Guilty" of the felony offense Engaging in Organized Criminal Activity – Theft >$150,000 <$300,000, as charged in the indictment and so say you by your verdict.

## C.    Name of Owner or Special Owner

Appellant first takes issue with the application paragraph's failure to specify the owner or special owners of the stolen property. "Although the name of the owner is not a substantive element of theft, the State is required to prove, beyond a reasonable doubt, that the person (or entity) alleged in the indictment as the owner is the same person (or entity) . . . as shown by the evidence." *Garza v. State*, 344 S.W.3d 409, 412 (Tex. Crim. App. 2011) (quoting *Byrd v. State*, 336 S.W.3d 242, 251 (Tex. Crim. App. 2011) (emphasis omitted)).

---

[14]    The indictment included a second paragraph alleging that Hollins committed the same offense "as a member of a criminal street gang, to-wit: the Bloods." As noted earlier herein, Hollins does not challenge the jury's determination that he was a member of a criminal combination or criminal street gang.

### 1. Error

We first determine that the failure to name the owner or special owners of the stolen property was not erroneous. Again, the name of the owner is not a substantive element of theft. *Id*. Further, the State did prove, beyond a reasonable doubt, that the owners of the stolen funds were Creekside Cinemas and Target, as alleged in the indictment. *See id*. Likewise, the State presented evidence that Ellsworth was a loss prevention employee for Target who aided Detective Mahoney in his investigation, and other testimony identified Marie Engelhardt[15] as the general manager for Creekside Cinemas. *See id*. at 412–13 (noting that "[o]ther cases have held that ownership may be alleged as either the actual or a special owner" and that "the legislature has given 'owner' an expansive meaning: anyone having a possessory interest in the property through title, possession, whether lawful or not, or a greater right to possession of the property than the defendant, is an owner of the property"). Additionally, as the State points out, our sister court has held that inclusion of the language "as charged in the indictment" in the application paragraph defeated an appellant's claim that his charge's application paragraph was erroneous for failing to include the burglary element from the transferred intent application paragraph in a capital murder case. *See Rolle v. State*, 367 S.W.3d 746, 758–59 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). The charge here included this language, and

---

[15] The court reporter transcribed Engelhardt as "Anglehart."

the indictment was read to the jury at the beginning of trial. *See also Dinkins*, 894 S.W.2d at 339 ("When we review a charge for alleged error, we must examine the charge as a whole instead of a series of isolated and unrelated statements.") (citations omitted).

### 2. Harm

Even if the State's failure to include the names of the owners or special owners of the stolen funds in the charge constitutes error, we nevertheless conclude that any such error would not rise to the level of egregious harm. *See Alcoser*, 663 S.W.3d at 165. We address each of the relevant considerations in turn below.

### *Entire Jury Charge*

First, when considering the entire jury charge, *see id*., subsequent portions of the charge concerning two lesser-included offenses *did* identify the owners and special owners by name. Specifically, under the headings "**LESSER INCLUDED OFFENSE OF THEFT >$30,000<$150,000**," and "**LESSER INCLUDED OFFENSE OF THEFT >$2,500<$30,000**" the charge described "the owners Target, special owner Mike Ellsworth,[16] Creekside Cinema, [and] special owner Marie Engelhardt." Thus, in viewing the charge as a whole, other portions of the charge sufficiently informed the jury of the owners or special owners of the property.

---

[16] The court reporter transcribed the last name as "Elsworth."

26

Further, as noted above, the application paragraph included the phrase "as alleged in the indictment," and the verdict form included similar language: "as charged in the indictment." Again, the indictment identified the owners or special owners of the stolen money. When considering the charge and the verdict form, "the jury may have referred back to the indictment, which included the omitted . . . element." *See Sanchez v. State*, 2020 WL 1159044, at \*2 (Tex. App.—San Antonio Mar. 11, 2020, pet. ref'd) (mem. op., not designated for publication) (conducting harm analysis and determining review of entire jury charge weighed against finding of egregious harm) (citing *Hernandez v. State*, 10 S.W.3d 812, 820 (Tex. App.—Beaumont 2000, pet ref'd)).

### *State of the Evidence*

Second, we consider the state of the evidence, including contested issues and the weight of probative evidence. *See Alcoser*, 663 S.W.3d at 165. Here, the contested issue at trial was identity—whether appellant was one of the burglars. While the omitted element—the identity of the owner or special owners of the stolen money—was one aspect of appellant's motion for directed verdict, it was summarily overruled by the trial court given the testimony and the court's observation that Target "clearly [had] great[er] right of possession than somebody who is breaking and burglarizing it." Thus, the error in the charge did not relate to a contested issue. *See Sanchez*, 2020 WL 1159044, at \*2 (noting contested issue was identity of driver,

27

not whether a vehicle was used in flight, for purposes of harm analysis) (citing *Hutch v. State*, 922 S.W.2d 166, 174 (Tex. Crim. App. 1996)).

Further, video footage admitted at trial identified the owners or special owners as Creekside Cinemas and Target stores. Likewise, testimony identified Ellsworth as a loss prevention employee for Target, and Engelhardt as the theater's general manager who identified the exact amount of money stolen. Though appellant's counsel challenged the Target representative[17] on cross examination as to whether the money inside the ATMs was Target's money, all the State needed to show was that Target had a greater right of possession to the money than appellant. *See Garza*, 344 S.W.3d at 412. Based on the foregoing, there was sufficient evidence in the record to allow a jury to find, beyond a reasonable doubt, that Ellsworth and/or Target and Engelhardt and/or Creekside Cinemas were the owners or special owners of the stolen currency. *See Riley v. State*, 447 S.W.3d 918, 926 (Tex. App.—Texarkana 2014, pet. ref'd) (finding no egregious harm based on state of evidence supporting omitted element). The testimony and video footage were definitive as to which stores were burglarized. Thus, any harm resulting from the omission of the names of the owners or special owners was likely negated by the uncontested evidence supporting that element. *See Kucha v. State*, 686 S.W.2d 154, 156 (Tex. Crim. App. 1985) ("Considering that the evidence of the prior convictions was

---

[17]     Ellsworth did not testify at trial because he was no longer employed by Target.

28

undisputed, uncontradicted, and seemed to have been taken almost as a 'given' by the parties, we hold that the . . . [charge error] was not so harmful that it deprived appellant of a fair and impartial trial.").

### *Arguments of the Parties*

Lastly, during closing arguments, both sides referred to Creekside Cinemas and various Targets as the locations of the burglaries, i.e., the owners of the stolen funds. Appellant focused on what he considered a lack of evidence establishing his identity as one of the burglars; he did not dispute the identity of the owners or special owners of the funds. This factor weighs in favor of a finding of no egregious harm.

### *Other Relevant Information in the Record*

Appellant does not raise anything further from the record concerning the ownership issue. Additionally, there were no questions from the jury and thus nothing further to indicate the jury was confused by the court's charge. After reviewing the entirety of the record, nothing else in the record bears on this issue. Therefore, this factor weighs neither in favor nor against a finding of egregious harm. *See Ashton v. State*, 526 S.W.3d 490, 503 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (concluding that "fourth factor weighs neither in favor of [n]or against a finding of egregious harm" after determining there was "no additional relevant evidence" germane to the jury charge omission).

Considering the record, we conclude that appellant cannot establish egregious harm with respect to the failure to identify the owner or special owners in the application paragraph of the court's charge. *See Rolle*, 367 S.W.3d at 746; *Sanchez*, 2020 WL 1159044, at *5.

### 3. Other Language Concerning Offense

Appellant's brief also notes that "[t]he application paragraph is also missing the essential elements stating the offense of '*aggregate theft*;' 'pursuant to one scheme or continuing course of conduct;' [or] 'unlawfully appropriate, by acquiring or otherwise exercising control over property.'" After noting these purported omissions, appellant makes no argument as to why this was erroneous or how he was egregiously harmed by these omissions. His brief then discusses the charge's failure to name the owner or special owner in the application paragraph and makes no further mention of the other alleged omissions.

To assert an issue on appeal, an appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). An issue is waived on appeal if the appellant "does not adequately brief that issue, i.e., by presenting supporting arguments and authorities." *Wilson v. State*, 473 S.W.3d 889, 901 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (finding waiver when brief lacked argument regarding purported harm that occurred when certain evidence was admitted);

30

*Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (holding appellant inadequately briefed points that were not supported by argument and authorities as required by Rule 38.1). However, we note that the language appellant complains was omitted from the application paragraph was included in the abstract paragraphs above. "It is unnecessary and unworkable to repeat every abstract definition in the application paragraph." *Crum v. State*, 946 S.W.2d 349, 356 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd) (citing *Dinkins*, 894 S.W.2d at 339–40 (holding jury charge omitting culpable mental state in application paragraph not defective where definition given in abstract portion of charge)).

We overrule appellant's first issue.

## Motion to Suppress

In his second issue, appellant contends that the trial court erred in denying his motion to suppress. At trial, appellant made an oral motion to suppress the evidence obtained during Trooper Royal's traffic stop, arguing that Trooper Royal lacked reasonable suspicion for the stop.[18] Following a hearing outside the presence of the jury, the trial court orally denied appellant's motion.[19]

---

[18]  At trial, appellant also sought to suppress statements he made to Trooper Royal during the traffic stop, arguing that Trooper Royal's questions constituted custodial interrogation. Appellant does not raise those arguments on appeal.

[19]  Nevertheless, the court's charge included an article 38.23 instruction, advising the jury "that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then . . . the jury shall disregard any such evidence so obtained." TEX. CODE CRIM. PROC. art. 38.23(a).

31

## A.    Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019); *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019). Under the bifurcated standard, the trial court is given almost complete deference in its determination of historical facts, especially if based on an assessment of demeanor and credibility, and the same deference is afforded to the trial court as to its rulings on the application of the law to questions of fact, and to mixed questions of law and fact, if resolution of these questions depends on an evaluation of demeanor and credibility. *See Martinez*, 570 S.W.3d at 281. However, our review of questions of law is de novo. *Id*. Likewise, we review de novo mixed questions of law and fact that do not turn on credibility and demeanor. *State v. Saenz*, 411 S.W.3d 488, 494 (Tex. Crim. App. 2013); *see also State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012) (holding that "[w]hen the posture of a case . . . presents only questions of the validity of the trial court's legal rulings . . . an appellate court's review is de novo") (internal quotations omitted).

We view the evidence in the light most favorable to the trial court's ruling, *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014), which we will sustain if it is correct on any applicable theory of law reasonably supported by the record, *State v. Ruiz*, 581 S.W.3d 782, 785 (Tex. Crim. App. 2019). "As the prevailing party

at the trial level, appellee gains the benefit of deference on factual findings made in [its] favor." *State v. Ford*, 537 S.W.3d 19, 23 (Tex. Crim. App. 2017) (citing *State v. Krizan-Wilson*, 354 S.W.3d 808, 815–16 (Tex. Crim. App. 2011)); *see also State v. Duran*, 396 S.W.3d 563, 571 (Tex. Crim. App. 2013) ("The winning side is afforded the 'strongest legitimate view of the evidence' as well as all reasonable inferences that can be derived from it.") (quoting *State v. Weaver*, 349 S.W.3d 521, 525 (Tex. Crim. App. 2011)). However, whether the facts, as determined by the trial court, add up to reasonable suspicion or probable cause to support a search or seizure under the Fourth Amendment is a legal question to be reviewed de novo. *See Ford*, 537 S.W.3d at 23; *Byram v. State*, 510 S.W.3d 918, 923 (Tex. Crim. App. 2017); *Duran*, 396 S.W.3d at 571; *Weaver*, 349 S.W.3d at 525; *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010).

## B.  Applicable Law

"When a police officer stops a defendant without a warrant, the State has the burden of proving the reasonableness of the stop at a suppression hearing." *State v. Cortez*, 543 S.W.3d 198, 204 (Tex. Crim. App. 2018). "An officer may make a warrantless traffic stop if the 'reasonable suspicion' standard is satisfied." *Jaganathan v. State*, 479 S.W.3d 244, 247 (Tex. Crim. App. 2015) (citing *Guerra v. State*, 432 S.W.3d 905, 911 (Tex. Crim. App. 2014)). "Reasonable suspicion exists if the officer has 'specific articulable facts that, when combined with rational

inferences from those facts, would lead him to reasonably suspect that a particular person has engaged or is (or soon will be) engaging in criminal activity.'" *Id.* (quoting *Abney v. State*, 394 S.W.3d 542, 548 (Tex. Crim. App. 2013)). "The standard requires only 'some minimal level of objective justification' for the stop." *Hamal v. State*, 390 S.W.3d 302, 306 (Tex. Crim. App. 2012) (quoting *Foster v. State*, 326 S.W.3d 609, 614 (Tex. Crim. App. 2010)). "We review a reasonable suspicion determination by considering the totality of the circumstances." *Cortez*, 543 S.W.3d at 204.

## C.    Trooper Royal's Testimony and Trial Court's Ruling

At the suppression hearing, Trooper Royal testified that he stopped the vehicle for an "obscured license plate." Trooper Royal testified that the license plate had a cover over it that obscured it, in violation of Texas law. *See* TEX. TRANSP. CODE § 504.945.[20] Trooper Royal testified that the speed limit in the area was seventy-five

---

[20]    Section 504.945 provides, in relevant part:

(a) A person commits an offense if the person attaches to or displays on a
    motor vehicle a license plate that:

   . . .

   (5) has blurring or reflective matter that significantly impairs the
       readability of . . . the letters or numbers of the license plate number
       at any time; [or]

   (7) has a coating, covering, protective substance, or other material that:

      (A)    distorts angular visibility or detectability;

34

miles per hour. He stated that he can normally read the license plates of vehicles traveling at that speed while parked on the side of the road, but appellant's vehicle got his attention because "there must have been a blur or something; [he] could tell there was a cover over the license plate."

Trooper Royal testified that he could not read the license plate until he was approximately two car lengths behind the vehicle.[21] Trooper Royal's dash camera footage from the traffic stop was admitted at the suppression hearing. Trooper Royal testified that the footage showed an obscured license plate. Still frames from the footage were also admitted, which depicted the rear of the vehicle at various times during the traffic stop. Trooper Royal testified that from the photo of the rear of the car after it stopped on the side of the roadway, approximately one-and-one-half car lengths in front of him, he could "not really" identify the license plate number. Trooper Royal denied that he could read the license plate from the still frame showing the vehicle as it traveled down I-35 in front of him before the stop.

---

    (B)    alters or obscures one-half or more of the name of the state in which the vehicle is registered; or

    (C)    alters, covers, or obscures the letters or numbers of the license plate number or the color of the plate.

TEX. TRANSP. CODE § 504.945.

[21] Trooper Royal also testified that the law required the plate to be visible from fifty feet. He testified that he believed that requirement was found in the administrative code. After reviewing Transportation Code section 504.945, Trooper Royal confirmed it did not have a distance requirement.

On cross-examination, Trooper Royal admitted he could see the "KGT" in the photo taken from the side of the roadway, but maintained that he could not make out the four numbers following the letters. He agreed with appellant's counsel that the plate had a "light black" covering. When questioned directly by the trial court, Trooper Royal stated that he would not have stopped appellant's vehicle if he could read the license plate from the point depicted in the photo taken while traveling on I-35, but he could not read it.

The trial court ultimately made the following ruling:

> All right. Then based upon what the Court has seen, the pictures and the photographs and the various exhibits, the Court will find, based upon the officer's testimony when I asked him that question that he could not read that license plate when he decided to make the stop, the Court finds him to be credible for the reasons I previously discussed. And thus, under 504.945 of transportation code, under Section (A)(7), the Court finds there was a coating[,] covering, protective surface or other material that altered or obscured the letters and numbers of the license plate from what the Court saw in the exhibits. . . . Looking at what the Court sees in [the exhibits], the Court sees that there is a distortion. You can't read the letters and numbers. And the Court finds the officer credible so that the stop is not unlawful.

**D.    Analysis**

Appellant argues that the license plate was not obscured because the numbers were legible at the time of the traffic stop, as depicted in the photos showing the vehicle stopped on the side of the roadway. Appellant also points to another photo of the vehicle taken by a license plate reader camera, proffered by the State at a different point at trial, and argues that if the Chrysler's plate could be read by the

36

plate reader, it was not obscured.[22] But the proper inquiry is whether Trooper Royal had reasonable suspicion to think the license plate was obscured or obstructed when he stopped appellant. *See Jaganathan*, 479 S.W.3d at 247 ("The question in this case is not whether appellant was guilty of the traffic offense but whether the trooper had a reasonable suspicion to think that she was.").

Giving the requisite deference to the trial court's findings of fact, particularly the credibility of Trooper Royal, we hold that the trial court did not abuse its discretion in determining that Trooper Royal had an objectively reasonable basis to believe that appellant's license plate was obscured in violation of Section 504.945. *See State v. Robinson*, No. 02-23-00167-CR, 2024 WL 2347658, at *3 (Tex. App.— Fort Worth May 23, 2024, pet. ref'd) (mem. op., not designated for publication) (holding that State elicited sufficient facts to prove officer had reasonable suspicion of traffic offense where officer testified that license plate had cover obscuring plate; court noted that under § 504.945(a)(7)(C), offense is committed if cover alters or obscures color of plate, "regardless of whether or not the officer had any difficulty reading the plate at the time of the stop"); *Czerwinski v. State*, No. 13-16-00472-CR,

---

[22] The State relied on the photo to show that appellant was at a certain location at a certain time. Appellant argues that we should apply the doctrine of unclean hands; essentially, that the State should not be allowed to rely on the clarity of the license plate for one purpose while contending it is obscured for the purpose of the motion to suppress. Whether the license plate was legible at some other point in time is not the focus of our inquiry. Instead, we consider whether Trooper Royal reasonably suspected the license plate was obscured at the time of the traffic stop. *See Jaganathan*, *supra*.

2018 WL 1959992, at *3 (Tex. App.—Corpus Christi–Edinburg Apr. 26, 2018, no pet.) (mem. op., not designated for publication) (holding that testimony from officer that license plate frame on defendant's vehicle obscured word "Texas" supported trial court's implicit finding that reasonable police officer would have suspected that license plate violated Section 504.945(A)(7)(B) and justified stop); *Walden v. State*, Nos. 11-13-00284-CR & 11-13-00285-CR, 2015 WL 3799225, at *3 (Tex. App.— Eastland June 18, 2015, pet. ref'd) (mem. op., not designated for publication) (holding that when officer could not read first digit on license plate because it was bent, he had probable cause to stop and detain driver for traffic violation, even if he could fully read license plate after vehicle stopped).

We overrule appellant's second issue.

## Expert Testimony

In his third issue, appellant argues that the trial court erred in admitting expert testimony from Detective Mahoney. Specifically, appellant challenges Detective Mahoney's qualifications as an expert and the reliability of Detective Mahoney's techniques for what appellant describes as "cell phone mapping."

### A.     Standard of Review

We review a trial court's determinations as to the admissibility of expert testimony under an abuse of discretion standard. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). The proponent of the expert testimony must

demonstrate by clear and convincing evidence that the testimony is sufficiently reliable and relevant to help the jury reach accurate results. *See* TEX. R. EVID. 702; *Wolfe v. State*, 509 S.W.3d 325, 335 (Tex. Crim. App. 2017) (citing *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992)).

There are three requirements for the admission of expert testimony: (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert's testimony will assist the trier of fact in deciding the case. *Rhomer*, 569 S.W.3d at 669. These requirements are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. *Id*.; *Davis v. State*, 329 S.W.3d 798, 813 (Tex. Crim. App. 2010). Here, appellant focuses on the qualification and reliability requirements.

## B.    Detective Mahoney's Testimony and the Trial Court's Ruling

Outside the presence of the jury, Detective Mahoney testified that he is a detective with NBPD. He holds a Bachelor of Arts degree in international studies, with a minor in geography. At the time of trial, Detective Mahoney had worked for the police department for fourteen years and as a detective for six years. Regarding his training, Detective Mahoney testified that after attending the police academy, he completed several months of field training. Additionally, he has completed various continuing education courses over his fourteen-year career. Detective Mahoney

testified that he has over 5,000 hours of TCOLE (Texas Commission on Law Enforcement) training. Detective Mahoney became interested in cell phone mapping in 2016, when another detective demonstrated the process in another case. Detective Mahoney testified that he thought this "was really remarkable" and he wanted to learn how to do it himself.

Detective Mahoney stated that a "major tool" used in his investigations is a search warrant issued to cell phone companies for records including text messages, calls, and location history. More specifically, he described the location data as "quite an in-depth thing" and testified that he has been to over one hundred hours of training in using a software mapping tool that can map where cell phone towers are located and what side of the tower a particular phone was located on during a given day and time. Detective Mahoney stated that he received the training from private companies including Geocell, ZetX, and Covert Media but described the companies as "law enforcement related." He has also attended a week-long course at the National Computer Forensic Institute in Hoover, Alabama, which focused on digital forensics and extracting data from cell phones. Detective Mahoney is also certified to operate Cellbrite equipment to extract data from cell phones.

In this case, Detective Mahoney and his team issued numerous search warrants to cell phone providers for various phone numbers used by the suspects. In response to the warrants, the cell phone providers produced call detail records

(CDRs), which document incoming and outgoing phone calls, incoming and outgoing text messages, and data usage. Detective Mahoney testified that these records are received in the form of a spreadsheet, and for each line on the spreadsheet, there is a cell tower or cell site location. He explained that each cell site has three antennas, and the records will indicate which side of the tower the phone was on when it communicated with the tower. According to Detective Mahoney's training, cell phones are programmed to connect to the tower or antenna with the strongest signal. He testified that he uses an estimated coverage area for each tower to put the cell phone within a certain distance of the tower. Detective Mahoney testified that Geocell teaches a way to estimate a tower's coverage area, and ZetX has a built-in tool for this in the software he uses to map records. Detective Mahoney stated that ZetX has conducted "millions of hours of drive scan testing" and determined that their estimations of tower coverage areas are "greater than 90 percent accurate." Further, ZetX is used by law enforcement agencies nationwide, including the U.S. Marshals and Secret Service.

Detective Mahoney also testified about ways to independently verify the location data. For example, in this case, Trooper Royal's dash cam footage showed appellant talking on the phone during the traffic stop on April 18. Detective Mahoney obtained phone records from T-Mobile showing that during the time of the traffic stop, appellant's phone was connected to a tower in that area. Similarly,

41

around the same time that the Chrysler passed a license plate reader in San Marcos, Texas on April 18, Hollins's phone records showed connections to towers in the general area. Detective Mahoney also testified that during the time Hollins was seen on surveillance footage in the gas station in Kyle, Texas on April 18, his phone was connecting to towers in that general area.

Detective Mahoney confirmed the location data only pertains to a particular device, not an individual, and it is up to the detective to link the device to a specific person. He testified that the mapping technology is frequently used in law enforcement investigations and has been admitted and accepted in courts of law. Detective Mahoney admitted that he had not previously testified as an expert in the field, but he has testified about mapping phone records. Detective Mahoney is unaware of any additional training he could receive in the field and testified that he did not know of any other police officers or detectives in Texas with as much training on the subject as he has.

At the conclusion of the hearing, appellant argued that the field was "highly specialized," involving "a degree of physics that is trying to pinpoint very specific data." He argued that Detective Mahoney could not answer questions concerning radio frequencies or how obstacles interfere with and slow down electromagnetic waves. Appellant also argued that the science itself was unreliable. He argued that the data sets used by Detective Mahoney were "created in the course of business"

and the records are kept by the cell phone provider's engineers. Appellant contended that the State needed to present a representative from the carrier to testify to the reliability of the data, because Detective Mahoney did not know how a tower's radius was calculated. Appellant also pointed out that Detective Mahoney could not identify any peer review establishing the data as reliable.

The trial court then made the following ruling:

> Counsel, I think he's qualified to testify based upon the training he's talked about, his experience since 2016. He seems to know enough to carry on a pretty good cross-examination with you as to the theories you asked him about . . . so that kind of proves up some of his expertise to me.

> He's verified some of the reliability of what he wants to testify to by doing checks that he knows how to do. He gave you the percentage that 90 percent of the towers -- or over 90 percent are accurate. And so I just -- I think that he's qualified to testify, and I think you can cross-examine and convince the jury that he doesn't know what he's talking about or this is an unreliable science. And that's the way we'll deal with it . . . .

> So I'm going to let -- I'm not going to be the one that excludes it based upon -- I also find it reliable, Counsel -- maybe I'm wrong too, and it won't be the first time in my life -- but when the whole world relies upon what those cell phone towers tell us on our bills and we all pay our bills in the world, I think the science is reliable.

> It may be other reasons what you say is true about what that tower measures, radiuses and things of that nature, but a lot of it has to do with this commercial enterprise. And that's what they put it there for. And I don't think they'd operate it if it wasn't reliable. They would do something different.

43

So I find some solace in the accuracy of what I think is being tested here, based upon the commercial utilization of it by all these companies that provide cell phone service. So I'll let it in.

## C. Qualifications

"Because the possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case." *Buford v. State*, 606 S.W.3d 363, 372 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *Rodgers v. State*, 205 S.W.3d 525, 527–28 (Tex. Crim. App. 2006) (internal quotations omitted)). To determine whether a trial court has abused its discretion in ruling on an expert's qualifications, an appellate court may consider three questions: (1) Is the field of expertise complex? (2) How conclusive is the expert's opinion? (3) How central is the area of expertise to the resolution of the case? *See Rhomer*, 569 S.W.3d at 669–70 (citing *Rodgers*, 205 S.W.3d at 528). "Greater qualifications are required for more complex fields of expertise and for more conclusive and dispositive opinions." *Id.* at 670 (citing *Rodgers*, 205 S.W.3d at 528).

Texas courts considering similar would-be experts and testimony—including this court—have held that the technique is not particularly complex. *See Thompson v. State*, 425 S.W.3d 480, 489 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (holding trial court did not abuse its discretion in allowing officer with forty hours of training in interpreting phone records to testify as expert when technique used

44

was not complex); *Robinson v. State*, 368 S.W.3d 588, 601 (Tex. App.—Austin 2012, pet. ref'd) (describing process of reading and analyzing cell phone records based on general understanding that cell phones connect to nearest tower location as "straightforward and not particularly complex"; officer had four years' experience in criminal intelligence unit and took training course in use of cell phone tracking); *Saenz v. State*, No. 13–10–00216–CR, 2011 WL 578757, at \*3 (Tex. App.—Corpus Christi–Edinburg Feb. 17, 2011, pet. ref'd) (mem. op., not designated for publication) (determining that three-day course on cellular phone tracking and twelve prior occasions performing such analyses were sufficient training and experience to qualify officer to interpret phone records; court noted that "[a]lthough the process involved in compiling the data is technically complex, the process involved in reading and analyzing the data is not").

As it relates to the second and third prongs, Detective Mahoney's testimony was neither conclusive nor dispositive. Detective Mahoney's testimony showed that on the day of all but one of the burglaries, appellant's phone traveled from Dallas to the general location of the burglary, that the phone was in the vicinity of each store in question around the time of the burglary, and that the phone called and received calls from various other members of the criminal combination on those dates. While this evidence tends to connect appellant to the crime scenes, it does not, standing alone, conclusively connect him to the crime. As discussed above, the jury heard

other evidence connecting appellant to the burglaries. After reviewing all three criteria, we conclude that the trial court did not abuse its discretion in determining that Detective Mahoney was qualified to testify as an expert. *See Robinson*, 368 S.W.3d at 601; *Saenz*, 2011 WL 578757, at *4.

**D.    Reliability**

We next consider whether the State demonstrated that Detective Mahoney's testimony was sufficiently reliable. The analysis for reliability of an expert's opinion differs for testimony based on hard science or soft science. "When an expert's testimony is based on a hard science involving precise calculations and the scientific method, the expert must satisfy the test set forth in *Kelly*, 824 S.W.2d at 573." *Rhomer*, 569 S.W.3d at 671 (citing *Morris*, 361 S.W.3d at 654). But if the expert's testimony is based on soft sciences or fields based primarily upon experience and training as opposed to scientific methods, the testimony "is held to a less rigorous standard than hard science testimony" as outlined in *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds, State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999). *Allison v. State*, 666 S.W.3d 750, 759 (Tex. Crim. App. 2023).

Appellant argues for the application of the *Kelly* analysis, citing the seven factors delineated therein for determining whether hard science expert testimony is sufficiently reliable. *See Kelly*, 824 S.W.2d at 573 (discussing factors including

existence of literature supporting or rejecting the underlying scientific theory, potential rate of error of technique, and peer review, among others). Here, however, Detective Mahoney's testimony concerning cell phone mapping was based on his training and experience, rather than some hard scientific inquiry based on mathematical calculations. *See Rhomer*, 569 S.W.3d at 671 (applying *Nenno* framework to accident reconstruction expert testimony where expert "used physical evidence to put together a fairly simple jigsaw puzzle"); *Brantley v. State*, 606 S.W.3d 328, 340–41 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (determining that expert's testimony concerning black box data "did not rely on precise measurement, calculation, or prediction" and thus *Nenno* standard applied). Therefore, we will analyze Detective Mahoney's testimony under the *Nenno* test in assessing its reliability. Under *Nenno*, we consider whether: (1) the field of expertise is a legitimate one, (2) the subject matter is within the scope of the expert's field of expertise, and (3) the expert testimony properly relies upon or utilizes the principles involved in the field. *Nenno*, 970 S.W.2d at 560–61; *accord Hernandez v. State*, 53 S.W.3d 742, 751 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd).

As to the first prong—whether Detective Mahoney's field of expertise is legitimate—though we have located no case specifically holding that cell phone mapping is a legitimate area of expertise, we note that numerous courts have affirmed the admission of similar expert testimony. *See, e.g.*, *Thompson*, 425 S.W.3d

47

at 528; *Robinson*, 368 S.W.3d at 601; *Saenz*, 2011 WL 578757, at *3; *see also Wells v. State*, 675 S.W.3d 814, 829 (Tex. App.—Dallas 2023, pet. granted on other grounds) (noting that Dallas Court of Appeals "and many others have already concluded that maps based solely on cell-site location data, including specifically ZetX mapping, are sufficiently reliable to be admissible at trial" and collecting cases); *Wilson v. State*, 195 S.W.3d 193, 201–02 (Tex. App.—San Antonio 2006, no pet.); *Ward v. State*, No. 14-15-00473-CR, 2016 WL 6238339, at *10 (Tex. App.—Houston [14th Dist.] Oct. 25, 2016, pet. ref'd) (mem. op., not designated for publication); *Patterson v. State*, No. 05-13-00450-CR, 2015 WL 2400809, *6–8 (Tex. App.—Dallas May 19, 2015, pet. ref'd) (mem. op., not designated for publication). Detective Mahoney offered testimony concerning how appellant's phone number was obtained, how he received records from appellant's cell phone service provider via search warrant, the basic functioning of cell phone towers and how they connect to a cell phone, and how he uses his training and experience to analyze the data provided by the service provider and employs various software to map the data. We conclude that Detective Mahoney's field of expertise is legitimate.

Likewise, Detective Mahoney testified within the scope of his expertise. *See Rhomer*, 569 S.W.3d at 671 (citing *Nenno*, 970 S.W.2d at 561). He explained the basic process of how cell phones connect with cell towers or cell sites. He testified about the process of taking the raw data received from the cell phone provider and

48

how he used that data in this case to plot the towers appellant's cell phone connected to on given dates and times on a map. He discussed the software he used to do so and the training he received in using the software. Further, Detective Mahoney identified three instances where he was able to independently corroborate the cell phone location information for appellant's phone: (1) from the dash cam depicting appellant using his phone during the traffic stop, (2) from the license plate reader's photo of the vehicle, and (3) from surveillance footage from the gas station. While Detective Mahoney could not explain the algorithms or underlying calculations used by the cell providers to determine the radius of a cell phone tower, he did not offer opinions on these topics. *See Brantley*, 606 S.W.3d at 341. Detective Mahoney's testimony did not stray from cell phone mapping, and thus the subject matter of his testimony was within the scope of his field of expertise.

Lastly, as to whether Detective Mahoney's testimony properly relied upon or utilized the principles involved in the field, Detective Mahoney's opinions were based on his over one hundred hours of training in using a software mapping tool and his experience in using cell phone mapping in his detective work since 2016. Although appellant contends Detective Mahoney's testimony is unreliable because he "cannot articulate the extent to which the underlying theory and technique were accepted as valid by the relevant scientific community," "cannot produce or even prove [the] existence of literature" supporting the theory or technique, "has no idea

of the potential rate of error" and admits that the cell phone tower's radius "is merely an estimation," the evidence of Detective Mahoney's training and experience discussed above provide a sufficient basis for the trial court to determine that his testimony was reliable. Complaints such as these go to the weight of the evidence, not its admissibility. *See Hernandez*, 53 S.W.3d 742 (quoting *Nenno*, 970 S.W.2d at 562); *Brantley*, 606 S.W.3d at 341; *Trejo v. State*, 683 S.W.3d 815, 824 (Tex. App.—San Antonio 2023, no pet.) ("But objections to [expert testimony's] reliability, such as complaints of analytical gaps, will most likely go to the weight of the evidence rather than to its admissibility.").

Based on the foregoing, we hold that the trial court did not abuse its discretion in admitting Detective Mahoney's expert testimony regarding his mapping of appellant's cell phone records in this case. We overrule appellant's third issue.

## Conclusion

Having overruled each of appellant's issues, we affirm.

Amparo Monique Guerra
Justice

Panel consists of Chief Justice Adams and Justices Goodman and Guerra.

Do not publish. TEX. R. APP. P. 47.2(b).